[1] Paul Filippi, Sr. is a named party in Plaintiff's original and Amended Complaint; however, he is not identified in the caption of Plaintiff's Second Amended Complaint.
[2] By stipulation of the parties in February of 2008, Marion Filippi was substituted as a defendant with her sons, Paul C. Filippi, Steven C. Filippi and Blake A. Filippi.
 DECISION
Before this Court are the cross-motions for summary judgment of Plaintiff Smithfield Estates, LLC ("Smithfield Estates") and Defendants Paul Filippi, Jr., Steven Filippi, and Blake Filippi (collectively, the "Filippis") on the Filippis' counterclaim asserted in this quiet title action. Also before the Court are four separate motions for partial summary judgment filed by the Filippis pertaining to res judicata, judicial estoppel, marketable title, and adverse possession issues. This matter arises from the disputed ownership of certain parcels of real property located within the Town of Smithfield, Rhode Island. Jurisdiction is pursuant to R.I. Gen. Laws 1956 § 8-2-14.
 I Facts and Travel
The controversy before this Court is preceded by an extensive history originating at the turn of the Nineteenth Century with a man possessing a hefty amount of tea, a large *Page 14 
plat of land, and a contemplated vision. It was in 1902 that this man, tea merchant John M. Hathaway, prepared and recorded a plat of land situated primarily on the westerly side of the thoroughfare known as Douglas Pike in the Town of Smithfield, Rhode Island.[3]
(Second Am. Compl. ¶ 4.) This plat of land, designated as "Lake View Park," consisted of nine hundred and eighty-seven (987) small lots, the majority of which were sixty (60) feet by twenty-five (25) feet in dimension. Id at ¶ 4; see also Pl. Mem. Ex. 1: Plan of Lake View Park.[4] The Lake View Park lots were deliberately divided in such a manner to enable the purchase of the lots to occur in conjunction with the sale of tea. Specifically, John M. Hathaway and his agents provided each tea purchaser the opportunity to procure one lot within Lake View Park per one pound of tea, in exchange for a $2.00 fee to cover the cost of executing the warranty deed. See Hathaway Morse v. O'Gorman Co.,26 R.I. 476, 59 A. 397 (1904) (detailing this particular promotion for the sale of tea). Accordingly, such land parcels are referenced as "tea lots." The ownership of approximately five hundred and fifty (550) Lake View Park tea lots are presently at issue.
In addition to Lake View Park, the record reflects that John M. Hathaway also platted tea lots on land located to the east of Douglas Pike. This second plat, known as Chestnut Knoll Park ("Chestnut Knoll"), comprised four hundred and forty-nine (449) tea lots on seventeen (17) acres. See Pl. Mem. Ex. 3: Plat Maps. While none of the tea lots *Page 15 
within Chestnut Knoll are in dispute in this case, the Filippis maintain that certain conduct by the parties involving Chestnut Knoll plays a role in this Court's forthcoming ownership analysis of the Lake View Park tea lots at issue.
 A Key Conveyances from 1950 to 1990
While the vast majority of the tea lots were ultimately conveyed, very few purchases resulted in any significant amalgamation of adjoining parcels.[5] (Second Am. Compl. ¶ 9.) Consequently, Lake View Park remained undeveloped. Proposed streets were never laid out, and the topography endured as wooded land contrary to what John M. Hathaway had envisioned.[6]Id. at ¶¶ 5-6. Over time, many tea lot purchasers passed away, and heirs to the undeveloped tea lots ceased paying property taxes. This extensive tax delinquency and virtual abandonment prompted the Town of Smithfield (the "Town") to conduct a tax sale in June of 1950 concerning nearly three hundred and thirty (330) of the tea lots scattered throughout Lake View Park. After receiving no bids for the real estate, the Town's Tax Collector conveyed these lots to the Town by virtue of a tax deed executed on July 18, 1950. (Pl. Suppl. Ex. 15: Tax Deed dated July 18, 1950.) Subsequent to this tax sale, the Town sold the tax titles associated with the approximately three hundred and thirty (330) tea lots to a couple known as Edith and Walter Belcher (the "Belchers"). See
Pl. Suppl. Ex. 16: Town Treasurer's Deed dated June 1, 1953 ("1953 Tax Deed"). *Page 16 
Prior to acquiring these tea lots, the Belchers had purchased real estate north of Lake View Park from an individual known as Margaret Downes (the "Downes Land"). A warranty deed dated September 28, 1951 effectuated this conveyance (the "Downes Deed"), specifically designating the southern boundary of the parcel as Lake View Park. (Pl. Suppl. Ex. 14: Downes Deed dated Sept. 28, 1951.) The Belchers purchased the Downes Land assumingly inclusive of an existing homestead. The actual dwelling, however, was situated outside of the legal description included in the Downes Deed, apparently unbeknownst to the Belchers at the time of conveyance.[7] (Pl. Suppl. Ex. 22: Dep. of Sarah Hayes at pp. 12-13; see also Defs. Mem. Ex. 4: Smithfield GIS Overview Map.) The Belchers occupied the homestead nonetheless, purchasing the tax titles to the approximately three hundred and thirty (330) surrounding Lake View Park tea lots (the "Belcher Tea Lots") two years later from the Town in 1953.
Through a series of familial transfers, the Belchers ultimately conveyed their interests in the Belcher Tea Lots and the Downes Land in 1964 to Edith Belcher and her daughter, Sarah Hayes, [8] as joint tenants. (Second Am. Compl. ¶¶ 14-16; see also
Pl. Suppl. Ex. 17: Quitclaim Deed dated July 13, 1964.) In 1969, Sarah Hayes and her mother sold a portion of the Belchers' real estate holdings to an individual known as Louis J. Giuliano by way of quitclaim deed (the "Giuliano Deed"). (Aff of Sarah Hayes ¶ 20.) While the Giuliano Deed used a metes and bounds description unlike the legal description set forth in the Downes Deed, the record reflects that the subject parcel was likely located within the Downes Land, and did not comprise any Belcher Tea Lots *Page 17 
within Lake View Park.[9] See Aff. of Sarah Hayes Ex. 10: Giuliano Deed; see also Defs. Mem. Ex. 42: Dep. of Edith Belcher[10] pp. 40-41.)
Meanwhile, across from Lake View Park, Paul Filippi, Sr — the father of the Filippi Defendants — owned and operated a restaurant on the easterly side of Douglas Pike called Ballards of Smithfield ("Ballards"). (Defs. Mem. Ex. 37: Dep. of Marion Filippi pp. 10-12.) Evidence submitted by the Filippis indicates that portions of Ballards and its accompanying parking area physically encroached upon land within Chestnut Knoll that Paul Filippi, Sr. did not own. (Defs. Mem. Ex. 4: Town of Smithfield GIS Map; Defs. Mem. Ex. 5: Town of Smithfield GIS Map marked with encroachments; Defs. Mem. Ex. 45: Dep. of Paul Filippi, Sr.[11]
pp. 3-4.) Apparently piqued with interest, Paul Filippi, Sr. inquired at the Smithfield Town Hall as to the ownership status of the Chestnut Knoll property adjacent to Ballards at some point in 1970. (Defs. Mem. Ex. 45: Dep. of Paul Filippi, Sr. pp. 3-4.) Discussions among Paul Filippi, Sr., Town Tax Assessor Fred P. Austin ("Mr. Austin" or "Tax Assessor"), and Town Solicitor John H. Hines, Jr. ("Mr. Hines" or "Town Solicitor"), revealed that the adjacent Chestnut Knoll lots were indeed tea lots that remained delinquent in property taxes. Id. at pp. 4-5. As a result of these discussions, Paul Filippi, Sr. and the Tax Assessor reached an agreement by which Paul Filippi, Sr. would pay the back taxes associated with certain Chestnut Knoll and Lake View Park tea lots, and in exchange for these payments, the Town would *Page 18 
convey title relative to these lots (the "Filippi Conveyance").Id. at pp. 5-6. Consequently, Mr. Hines and Paul Filippi, Sr. executed a quitclaim deed on May 12, 1970 (the "Hines Deed") conveying ninety-six (96) Chestnut Knoll tea lots (the "Filippi Chestnut Knoll Lots") and five hundred forty-nine (549) Lake View Park Tea Lots[12] (the "Disputed Lots") from Mr. Hines to B. I. Realty, Inc. ("B. I. Realty"), a Rhode Island entity owned by Paul Filippi, Sr. at that time.[13] (Pl. Mem. Ex. 4: Hines Deed.)
While the parties dispute the validity of the Filippi Conveyance, both Smithfield Estates and the Filippis concur that the Town's Tax Assessor likely facilitated the transfer to reinstate the abandoned tea lots to the tax rolls without surmounting what the Town believed to be the "impractical" tasks of determining ownership and fulfilling the requisite tax sale notice procedures. (Defs. Mem. Ex. 41: Dep. of John Hines at pp. 37-39; Defs. Mem. Ex. 45: Dep. of Paul Filippi, Sr. at pp. 7-8.) Testimony by Mr. Hines elicited several years subsequent to the Filippi Conveyance indicated that he drafted the Hines Deed at the direction of the Tax Assessor, that he signed the Hines Deed in his capacity as Town Solicitor, and that he and his wife individually had no right, title or interest in the tea lots conveyed to B. I. Realty. (Pl. Mem. Ex. 7: Aff of John and Rosalie Hines dated March 4, 1987 ("Hines Aff"); Defs. Mem. Ex. 41: Dep. of John Hines at p. 39.) An Affidavit signed and recorded in 1987 by Mr. Hines and Rosalie Hines evinces that the "sole and only purpose" of executing the Hines Deed "was to vest `color of title' to the real property" transferred to B. I. Realty. (Pl. Mem. Ex. 7: Hines Aff. at ¶ 4.) *Page 19 
Following the Filippi Conveyance, the surfacing of certain deeds purporting to transfer title to various Lake View Park and Chestnut Knoll tea lots further convoluted the ownership status of these parcels. The first of these conveyances occurred on April 16, 1975 when an individual known as Leonard W. Hathaway, claiming to be an heir of John M. Hathaway, exercised the right of redemption under the tax titles associated with the Belcher Tea Lots. (Pl. Suppl. Ex. 25: Treasurer's Certificate dated April 16, 1975.) On the same date, Leonard W. Hathaway executed a deed conveying the redeemed Belcher Tea Lots to an individual identified as Domenic D'Ambra of North Providence, Rhode Island (the "D'Ambra Deed"). (Pl. Suppl. Ex. 26: Quit-Claim Deed dated April 16, 1975 and recorded April 18, 1975.)
Approximately two weeks after the execution of the D'Ambra Deed, Domenic D'Ambra ("Mr. D'Ambra") conveyed the Belcher Tea Lots to East Coast Land Development Corporation of North Providence, Rhode Island ("East Coast"). (Pl. Suppl. Ex. 27: Warranty Deed dated May 1, 1975 and recorded May 5, 1975.) Mere days later, East Coast deeded the same lots back to Mr. D'Ambra. (Pl. Suppl. Ex. 28: Warranty Deed dated and recorded May 8, 1975.) That same date, Mr. D'Ambra and his wife granted a mortgage to Domestic Safe Deposit Company relative to the Belcher Tea Lots.[14] (Pl. Suppl. Ex. 29: Mortgage Deed dated May 7, 1975 and recorded May 8, 1975.) Subsequently, Mr. D'Ambra executed a warranty deed transferring the Belcher Tea Lots to Maine Development, Inc., a Rhode Island corporation. (Pl. Suppl. Ex. 30: Warranty Deed dated July 29, 1975.)
The record reflects that Leonard W. Hathaway apparently was not the only individual claiming to be an heir of the tea merchant John M. Hathaway during the *Page 20 
1970's. In 1976, Alexis Proctor, an alleged heir, [15] executed a quitclaim deed that identified the same Chestnut Knoll and Lake View Park tea lots as those delineated in the Hines Deed and purportedly transferred these lots to a man named Crescenzo Conti (the "Conti Deed"). (Defs. Mem. Ex. 24: Quit-Claim Deed dated April 27, 1976 and recorded May 17, 1976.) Crescenzo Conti ("Mr. Conti") did not further transfer title to any tea lots seemingly conveyed to him through the Conti Deed.
During the 1980's, B. I. Realty transferred its interests in the Filippi Chestnut Knoll Lots and the Disputed Lots on two occasions. On May 18, 1981, Marion Filippi, as acting President of B. I. Realty, executed a quitclaim deed transferring the Ballards property and certain Filippi Chestnut Knoll Lots to an individual known as Edward Notorantonio, Jr. ("Mr. Notorantonio"). (Defs. Mem. Ex. 16: Notorantonio Deed executed May 18, 1981.) The next year, Mr. Notorantonio filed a quiet title action in Rhode Island Superior Court relative to five of these lots, [16]
captioned Notorantonio v. Morris et al
C.A. No. PC-82-3314 (the "Notorantonio Action"). Based on Mr. Notorantonio's claim of adverse possession by him and his predecessors in interest, the Superior Court adjudged Mr. Notorantonio as the fee simple owner of the subject realty. (Defs. Mem. Ex. 17: Notorantonio Action Judgment.) *Page 21 
The second conveyance by B. I. Realty occurred on December 30, 1986, when B. I. Realty transferred its interest in the Disputed Lots and remaining Filippi Chestnut Knoll Lots to Paul Filippi, Sr., individually. (Defs. Mem. Ex. 22: Quitclaim Deed dated Dec. 30, 1986.) The following year, Paul Filippi, Sr. conveyed his interest to himself and his wife, Marion, as tenants by the entireties.[17] (Defs. Mem. Ex. 22: Quitclaim Deed dated Sept. 30, 1987.)
 B Past Tea Lot Litigation
The overlapping and complicated nature of the potential ownership interests within Chestnut Knoll and Lake View Park inevitably led to litigation intended to quiet title to various tea lots. Edith Belcher and her daughter, Sarah Hayes, filed the first of these actions in November of 1982, captioned Edith M. Belcher and SarahSangiovanni v. Heirs at Law of John M. Hathaway et al, C.A. No. PC-82-461 (the "Belcher I Action"). (Pl. Supp. Ex. 18: Belcher I Action Complaint filed Nov. 23, 1982.) Subsequent lawsuits were initiated by Mr. Conti, the Belchers, and an individual known as Paul Surabian, discussed infra.
 1 The Belcher I Action
Apparently motivated by Leonard W. Hathaway's attempt to redeem the interests in the Belcher Tea Lots in 1975, Edith Belcher and Sarah Hayes sought to quiet title to these lots based on the 1953 Tax Deed from the Town, as well as claims of adverse possession. Id. at ¶¶ 8-9, 16. The Belcher I Action Complaint, originally filed by the *Page 22 
plaintiffs pro se, named the following defendants: heirs at law of John M. Hathaway, Mr. D'Ambra, East Coast, Maine Development, Inc., Antoinetta D'Ambra, Domestic Safe Deposit Company, Leonard W. Hathaway, and unknown heirs at law of John M. Hathaway. Neither B. I. Realty nor Mr. Conti was a named party to the Belcher I Action.
Ultimately, the Rhode Island Superior Court entered an Order and Judgment in the Belcher I Action foreclosing the right of redemption under the 1953 Tax Deed, and adjudging Edith Belcher and Sarah Hayes as the fee simple owners of the subject tea lots by virtue of the plaintiffs' adverse possession.[18] (Pl. Suppl. Ex. 19: Belcher I Action Order and Judgment entered Oct. 2, 1989.) The Superior Court also entered a Notice of Disposal in Tax Lien Case ("Notice of Disposal"), which was subsequently recorded in the Town's Land Evidence Records as notice of the final disposition in the Belcher I Action as to the foreclosure of all rights of redemption. (Pl. Suppl. Ex. 20: Belcher I Action Notice of Disposal.)
Interestingly, the record discloses that the Judgments entered in the Belcher I Action may have affected title to additional Lake View Park tea lots that were not actually Belcher Tea Lots acquired by way of the 1953 Tax Deed. While Sarah Hayes has testified by sworn affidavit that the Belcher I Action concerned only those lots that the Belchers had been granted by the Town via the 1953 Tax Deed (Aff. of Sarah Hayes ¶¶ 7-8), the Filippis direct this Court to certain portions of the record that indicate otherwise. In particular, the Belcher I Action Complaint, while specifically citing to the 1953 Tax Deed, sought to quiet title to approximately sixty (60) additional tea lots not *Page 23 
conveyed by that deed (the "Extra Lots").[19] (Pl. Suppl. Ex. 18: Belcher I Action Complaint ¶ 1.) The Order of Notice by Publication in the Belcher I Action also lists these Extra Lots. However, the Belcher I Action Judgment itself does not individually enumerate the Lake View Park tea lots subject to the Court's ruling. Instead, the Judgment refers to the "real estate described in the complaint." (Pl. Suppl. Ex. 19: Belcher I Action Order and Judgment ¶¶ 2-4.) The Consent Judgment does enumerate the lots at issue and includes the Extra Lots. (Pl. Suppl. Ex. 21: Consent Judgment.) According to the Filippis' calculations, forty-eight (48) of these Extra Lots listed in the Belcher I Action Complaint are in fact tea lots claimed by the Filippis by virtue of the Hines Deed.[20] See
Defs. Opp. at pp. 12-15.
 2 The Conti Action
Before resolution of the Belcher I Action, Mr. Conti initiated a separate quiet title action, entitled Crescenzo Conti v. JohnHines, et al., C.A. No. PC-87-5072, concerning the Lake View Park and Chestnut Knoll tea lots identified in the 1976 Conti Deed (the "Conti Action").[21] Mr. Conti named several defendants: Mr. Hines and his wife, B. I. Realty, Edith Belcher, Edward Notorantonio, Sr., Edward Notorantonio, Jr., Paul Filippi, *Page 24 
Sr., Marion Filippi, East Coast, and an entity called Douglas Construction and Supply Corporation. (Defs. Mem. Ex. 29: Conti Action Compl.)[22] In his complaint, Mr. Conti asserted ownership by virtue of valid conveyance, but made no specific claims based on a theory of adverse possession pursuant to Rhode Island statutory law. See id. In response, Paul Filippi, Sr., Marion Filippi and B. I. Realty filed counterclaims, seeking judgment as to the validity of their title by reason of the Hines Deed and adverse possession. (Defs. Mem. Ex. 29: Filippi Ans. and Counterclaim in Conti Action.) Edith Belcher also asserted counterclaims against Mr. Conti, alleging that she was the true owner of the Lake View Park tea lots described in the Conti Complaint by virtue of deed and/or adverse possession.[23]
(Defs. Mem. Ex. 29: Belcher Ans. and Counterclaim in Conti Action.)
Sarah Hayes, who subsequently intervened in the Conti Action in 1990 following a final disposition in the Belcher I Action, asserted title to at least a "portion" of the parcels set forth in Mr. Conti's complaint. (Defs. Mem. Ex. 29: Hayes Ans. and Counterclaim in Conti Action.) This portion claimed by Sarah Hayes comprised the Extra Lots listed in the Belcher I Action Complaint. Of note, Sarah Hayes specifically pled in her counterclaim that title to the Extra Lots was quieted in the Belcher I Action, precluding Mr. Conti from making any claim regarding those lots.Id. Based on these allegations, Sarah Hayes sought damages for slander of title. Id.
In January of 1993, Mr. Conti's claims in the Conti Action were dismissed with prejudice prior to trial due to Mr. Conti's repeated failure to file a court-ordered *Page 25 
title abstract in compliance with G.L. 1956 § 34-16-2.[24]
(Defs. Mem. Ex. 29: Orders and Final Judgments in Conti Action.) On appeal, the Rhode Island Supreme Court upheld the trial court's dismissal of Mr. Conti's claims. See Conti v. Hines,659 A.2d 117 (1995). Although a considerable amount of discovery ensued prior to dismissal, no factual or legal determinations were ever made as to any party's interest claimed in the Conti Action.
 3 The Surabian Action
In 1997, an individual known as Paul Surabian ("Mr. Surabian") filed a quiet title action alleging ownership of certain Belcher Tea Lots and Disputed Lots in the southeast portion of Lake View Park based on his actual occupation of the lots for over ten (10) years. This action, captioned Paul T. Surabian v. Maine Development etal, C.A. No. PC-97-0947 (R.I. Super. Ct. 1997), named multiple defendants, including Edith Belcher, Sarah Hayes, Marion Filippi, and Mr. Conti (the "Surabian Action"). (Defs. Mem. Ex. 30: Surabian Complaint.)[25] Mr. Surabian based his adverse possession claim on his operation of a construction equipment business on the subject lots, as well as the paving *Page 26 
of a parking lot, grading of land, erection of signage, construction of a building, and the storage and display of construction equipment and materials. Id. at ¶ 3.
The record reflects that Edith Belcher, Sarah Hayes, and Marion Filippi all answered Mr. Surabian's complaint, and that Mr. Conti answered and filed counterclaims and cross-claims in the Surabian Action seeking to quiet title to the lots made subject of the previously dismissed Conti Action. (Defs. Mem. Ex. 30: Answers and Counterclaims.) In 2000, Marion Filippi filed several Notices of Intent to Dispute Interrupting Adverse Possession in the Town's Land Evidence Records relative to the Disputed Lots claimed by Mr. Surabian. (Defs. Mem. Ex. 30: Notices of Intent.) Ultimately, the Surabian Action settled before trial, and a judgment entered on March 2, 2007 in favor of Mr. Surabian.[26]
 4 The Belcher II Action
On March 20, 2002, Edith Belcher and Sarah Hayes filed a second quiet title action, captioned Edith W. Belcher and Sarah E.Hayes v. Crescenzo Conti et al., C.A. No. PC-02-1462 (R.I. Super. Ct. 2002), seeking to quiet title to numerous Lake View Park tea lots contiguous to the Belcher Tea Lots, including lots claimed by the Filippis (the "Belcher II Action"). The rights and interests asserted by Edith Belcher and Sarah Hayes in the Belcher II Action were conveyed and assigned to Smithfield Estates in *Page 27 
September of 2002. (Pl. Suppl. Ex. 24: Conveyance and Assignment dated Sept. 18, 2002.) The Belcher II Action remains pending and unassigned to the trial calendar.
 C The Present Action
In addition to the assignment of the alleged interests asserted in the Belcher II Action, Edith Belcher and Sarah Hayes also sold to Smithfield Estates their interests in the Belcher Tea Lots confirmed in the Belcher I Action.[27] (Pl. Suppl. Ex. 23: Warranty Deed dated Sept. 17, 2002 and recorded Sept. 20, 2002.) Smithfield Estates subsequently purchased any interest in the Lake View Park tea lots held by Mr. Conti and continued to acquire deeds from a multitude of parties believed to hold title to certain tea lots. (Pl. Suppl. Exs. 36 through 60; Pl. Reply Mem. 15-18.)
Smithfield Estates filed the instant action on August 6, 2003, [28] seeking to quiet title to the entire westerly portion of Lake View Park by virtue of deed and by reason of its predecessors' actual, open, notorious, hostile, under claim of right, continuous and exclusive possession of the tea lots for a period exceeding ten (10) years. (Second Am. Compl. pp. 80-84.) On August 13, 2003, this Court appointed a title examiner to prepare a title report in accordance with G.L. 1956 § 34-16-1 etseq. Following two years of preparation, the examiner's title report was approved by this Court on August 4, 2005. Thereafter, the Court entered orders of notice by publication, and appointed both an attorney under the Soldiers' and Sailors' Civil Relief Act of 1940 and a guardian ad litem. Service of process was effected personally upon locatable parties and by *Page 28 
publication otherwise in September of 2005. Several parties filed answers with the Court, as did the guardian ad litem and the attorney for Soldiers and Sailors.
In response to Smithfield Estates' Second Amended Complaint, Marion Filippi filed an answer and counterclaim, as well as a cross-claim against Mr. Surabian. (Defs. Mem. Ex. 2: Filippi Ans., Counterclaim and Cross-claim.) In her counterclaim, Marion Filippi alleged that she was the fee simple owner of the Disputed Lots by virtue of deed and/or adverse possession, and that Smithfield Estates had no interest, right or title to those lots.[29]
(Defs. Mem. Ex. 2: Counterclaim at ¶ 13.) In August of 2006, Marion Filippi conveyed her claimed interests in the Disputed Lots and the Filippi Chestnut Knoll Lots to her three sons, Paul C. Filippi ("Paul"), Steven C. Filippi ("Steven") and Blake A. Filippi ("Blake") by way of quitclaim deed. Accordingly, Marion Filippi was substituted as a defendant in this case with her three sons by stipulation of the parties in February of 2008.
Since filing this action, Smithfield Estates continued to settle with named defendants, obtaining by deed any interests such defendants may have claimed in the Lake View Park tea lots. Considerable discovery ensued throughout 2007 and 2008 relative to the Filippi defendants, and this Court granted a motion to assign this case for trial in March of 2009. On March 8, 2010, Smithfield Estates' application for default against all non-responding parties was granted by this Court. As a result of this entry of default, the Filippis' claim to the Disputed Lots remained the only claim adverse to that of Smithfield Estates in this case. *Page 29 
 D Motions at Issue
On November 23, 2009, Smithfield Estates filed a motion for summary judgment on the Filippis' counterclaim, arguing that no genuine issue of material fact exists as to whether the Filippis have any rightful claim to any realty in Lake View Park, entitling Smithfield Estates to judgment on the Filippis' counterclaim as a matter of law. On January 25, 2010, the Filippis filed an objection to Smithfield Estates' motion for summary judgment, as well as a cross-motion for summary judgment on the Filippis' counterclaim. In addition, the Filippis filed four (4) separate motions for partial summary judgment on Smithfield Estates' complaint to quiet title.
The Filippis' first motion for partial summary judgment seeks to bar Smithfield Estates' claims of adverse and constructive possession over the Disputed Lots based on certain alleged acts of its predecessors in interest pursuant to the principle ofres judicata. First, the Filippis contend that any claims based on the alleged acts of the Belchers and their daughter, Sarah Hayes, prior to the Judgments entered in the Belcher I Action are barred by res judicata because the Belchers already alleged such acts during the Belcher I Action to obtain title to the "Extra Lots" and the Belcher Tea Lots in 1982. The Filippis contend the Belchers therefore should have asserted claims over the Disputed Lots at that time. Second, the Filippis aver that any claims based on the alleged acts of Mr. Conti prior to the Conti Action Judgment are barred by res judicata because a sufficient identity of issues and parties exists between this action and the Conti Action, and Mr. Conti's claims were dismissed with prejudice. Based on this argument, the Filippis also argue that any claims relying on Mr. Conti's deed from Alexis Proctor are likewise barred. *Page 30 
The second motion for partial summary judgment seeks to bar Smithfield Estates' claims of adverse and constructive possession over the Disputed Lots based on the acts of Mr. Conti pursuant to the principle of judicial estoppel. In support of this contention, the Filippis direct this Court to conflicting testimony by Mr. Conti in the Conti Action and in the Surabian Action concerning his possessory acts relative to the Lake View Park tea lots. The Filippis argue that Smithfield Estates should be required to maintain the least beneficial of Mr. Conti's contradictory representations regarding any alleged acts of adverse possession within the tea lots.
The third motion for partial summary judgment involves Smithfield Estates' claim for marketable title pursuant to G.L. 1956 § 34-13.1-1 et seq., discussed infra. The Filippis contend that Smithfield Estates fails to satisfy the requirements of this statute as a matter of law because the Belchers and Sarah Hayes never acquired a deed to the Disputed Lots, nor occupied the Disputed Lots in accordance with the statute.
Lastly, the Filippis have filed a fourth motion for partial summary judgment attacking the entirety of Smithfield Estates' claim to the Disputed Lots based on the theories of adverse and constructive possession. The Filippis maintain that no genuine issues of material fact exist, and that Smithfield Estates cannot establish the requisite elements of adverse or constructive possession as a matter of law.
The Court deferred hearing on the parties' respective motions after conference until March 17, 2010 to permit the parties to file supplemental memoranda clarifying the manifold issues placed before the Court as a result of the multiple filings. On February 26, 2010, Smithfield Estates filed its reply memorandum in support of its motion for summary judgment on the Filippis' counterclaim and in support of its objections to the *Page 31 
Filippis' cross-motion for summary judgment and partial summary judgment motions. In response, the Filippis filed a sur-reply memorandum on March 5, 2010.
On March 17, 2010, the parties appeared before this Court for hearing on all pending summary judgment motions. As set forth in its reply memorandum, Smithfield Estates argued at hearing that the Filippis lacked standing to challenge Smithfield Estates' efforts to quiet title because the Filippis had no ownership interest by virtue of a valid deed or adverse possession. Upon completion of the standing inquiry, this Court ultimately determined that the Filippis did indeed have standing to bring forth their counterclaim and to challenge Smithfield Estates' efforts to quiet title in this case. Subsequent to this Court's ruling on standing, the Court reserved decision on all summary judgment motions given the quantity and complexity of issues presented at hearing and in the parties' papers.
 II Standard of Review
On a summary judgment motion, this Court reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. Chavers v. Fleet Bank (RI), N.A.,844 A.2d 666, 669 (R.I. 2004). On such a motion, the Court is to determine only whether a factual issue exists. It is not permitted to resolve any such factual issues. The emphasis is on issue finding, not issue determination. O'Connor v. McKanna,116 R.I. 627, 633, 359 A.2d 350, 353 (1976); Palazzo v. Big GSupermarkets, Inc., 110 R.I. 242, 245, 292 A.2d 235, 237 (1972);Slefkin v. Tarkomian,103 R.I. 495, 496, 238 A.2d 742, 742 (1968). "Summary judgment is appropriate if it is apparent that no material issues of fact exist and the moving party is entitled to judgment as a matter of *Page 32 
law." Chavers, 844 A.2d at 669. A party opposing a motion for summary judgment "`carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.'" Id. at 669-70 (quotingUnited Lending Corp. v. City of Providence,827 A.2d 626, 631 (R.I. 2003)). Cross-motions simply require the Court to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. Curran v.Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (citing Barnes v.Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004) (quoting Wightman v. Springfield Terminal Ry.,100 F.3d 228, 230 (1st Cir. 1996)).
 III Analysis
Although the filing of Smithfield Estates' motion for summary judgment on the Filippis' counterclaim initiated the series of motions presently before the Court, this Court finds it appropriate to first address certain partial summary judgment motions filed by the Filippis relative to Smithfield Estates' claims.
 A Res Judicata
The Filippis' first motion for partial summary judgment concerns the potential preclusive effects of prior litigation involving the Lake View Park tea lots on Smithfield Estates' claims rooted in the possessory acts of its predecessors in interest. The doctrine ofres judicata, or claim preclusion, "renders a prior judgment by a court of competent jurisdiction in a civil action between the same parties conclusive as to any issues actually *Page 33 
litigated in the prior action, or that could have been presented and litigated therein."[30] Duffy v. Milder,896 A.2d 27, 35 (R.I. 2006) (quoting DiBattista v. State,808 A.2d 1081, 1085 (R.I. 2002)). Courts apply the doctrine ofres judicata to maximize judicial efficiency by eliminating repetitive litigation, Perez v. Pawtucket RedevelopmentAgency, 111 R.I. 327, 336, 302 A.2d 785, 791 (1973), and by preventing multiple and possibly inconsistent resolutions of the same lawsuit. Gaudreau v. Blasbalg,618 A.2d 1272, 1275 (R.I. 1993).
"[T]he doctrine of `[r]es judicata serves as an absolute bar to a second cause of action where there exists identity of parties, identity of issues, and finality of judgment in an earlier action.'"Bossian v. Anderson, 991 A.2d 1025, 1027 (R.I. 2010) (quotingIn re Sherman, 565 A.2d 870, 872 (R.I. 1989)). As to the second element (identity of issues), the Rhode Island Supreme Court has adopted the "transactional" rule as stated in the Restatement (Second) Judgments § 24. See Bossian,991 A.2d at 1027; see also ElGabri, 681 A.2d at 276. "Under this rule, all claims arising from the same transaction or series of transactions which could have properly been raised in a previous litigation are barred from a later action."DiBattista, 808 A.2d at 1086 (citing ElGabri,681 A.2d 271, 276 (R.I. 1996)). As such, "a party defeated in one action may not maintain a later lawsuit based upon a ground that properly could have been asserted in the previous litigation."DiBattista, 808 A.2d at 1086 (citing ElGabri,681 A.2d at 275); see Palazzo v. Alves,944 A.2d 144, 152 (R.I. 2008). This Court determines the applicability of res judicata as a *Page 34 
matter of law. Ritter v. Mantissa Inv. Corp.,864 A.2d 601, 605 (R.I. 2005) (citing Wright v. Zielinski,824 A.2d 494, 497 (R.I. 2003)).
The doctrine of res judicata applies to actions concerning real property, including actions to quiet title. See
Restatement (Second) Judgments § 43; Sleeper v. HobanFamily P'ship, 955 A.2d 879 (N.H. 2008). Thus, a judgment in a quiet title action bars subsequent litigation on the same cause of action between the same parties or their privies and is conclusive as to all issues actually litigated, as well as issues that should have been determined with regard to the property in question. Restatement (Second) Judgments § 43 cmt. b.
 1 The Belcher I Action
The Filippis maintain that a sufficient identity of parties and identity of issues exists to invoke the preclusive effect ofres judicata relative to Smithfield Estates' claims based on the possessory acts of the Belchers and Sarah Hayes prior to October 2, 1989 — the date final judgment entered in the Belcher I Action.[31] Specifically, the Filippis contend that such claims by Smithfield Estates are here barred because the issue of the Belchers' adverse possession over the Disputed Lots could have been litigated in the Belcher I Action. Smithfield Estates contends otherwise, averring that neither an identity of parties nor identity of issues exists between this case and the Belcher I Action to trigger the application of res judicata by this Court. *Page 35 
 i Identity of Parties
As to identity of parties, the Filippis contend that Paul Filippi, Sr., Marion Filippi and B. I. Realty were "de facto" parties to the Belcher I Action because that action sought relief against a broad class of defendants, including "all other persons unknown and unascertained" who may claim "any right title, interest, estate or lien . . . on said real estate described in Paragraph FIRST. . . ." (Defs. Ex. 28: Belcher I Action Complaint pp. 6-7.) On the contrary, Smithfield Estates avers that the Belcher I Action does not share an identity of parties with the case at bar, as the Belcher I Action named only eight (8) defendants connected to the Belcher Tea Lots at issue in that action, compared to the almost seven hundred (700) defendants named here.
The preclusive effect of res judicata only "relates to the effect of a final judgment between the parties to an action and those in privity with those parties." Lennon,901 A.2d at 591 (quoting E.W. Audet Sons, Inc.,635 A.2d at 1186). Parties are considered to be in privity with one another when "there is a commonality of interest between the two entities and when they `sufficiently represent each other's interests.'" Lennon, 901 A.2d at 591 (quoting Duffy,896 A.2d at 36 (quoting Commercial Union InsuranceCo. v. Pelchat, 727 A.2d 676, 680 (R.I. 1999))). "The term `privity' indicates a mutual or successive relationship to the same rights of property rather than simply a relationship between the persons." Sovereign Bank v. Fowlkes, C.A. No. PB 08-4330, 2010 WL 331965 (R.I. Super. Ct. Jan. 25, 2010) (citingO'Brien v. Costello,100 R.I. 422, 429, 216 A.2d 694, 698 (1966)). *Page 36 
Here, privity exists between Smithfield Estates and the Belchers and Sarah Hayes pursuant to the successive property relationship created subsequent to final judgment in the Belcher I Action.See O'Brien, 100 R.I. at 429, 216 A.2d at 698; seealso Restatement (Second) Judgments § 43 ("A judgment in an action that determines interests in real or personal property . . . [h]as preclusive effects upon a person who succeeds to the interest of a party to the same extent as upon the party himself). Indeed, "successive property relationships provide some of the oldest and best established rules for extending preclusion to nonparties." 18A Charles A. Wright, Federal Practice andProcedure § 4462 (2d ed. 2002). The principle that a successor in interest is bound by a judgment issued to his or her predecessor in interest serves important policy considerations; "otherwise a transfer of property would unsettle controversies which an action was intended to settle." Restatement (First)Judgments § 89 cmt. c.
The more difficult question, however, arises upon characterization of the Filippis' role, if any, in the Belcher I Action. Section 34 of the Restatement (Second) Judgments
defines a "party" as "a person who is named as a party to an action and subjected to the jurisdiction of the court." Generally, a person who has not been designated as a party, and who has not been given actual notice or brought within the jurisdiction of the court, is not a party for purposes of claim preclusion. See Wright,Federal Practice and Procedure § 4449.
Parties who should be joined as defendants in a quiet title action include "all those who appear of record to have a possible claim or interest in the property or all those who may have a substantial interest in the property and who will be materially affected by the decree." 65 Am. Jur. 2d Quieting Title § 65 (citingWacker Oil Inc. v. LoneTree Energy, Inc., *Page 37 459 N.W.2d 381 (N.D. 1990); Lakeview Trust Sav. Bank v.Estrada,134 Ill. App. 3d 792, 89 Ill. Dec. 569, 480 N.E.2d 1312 (1st Dist. 1985)). Typically, unknown persons who may have an interest in the subject property are made parties defendant in quiet title actions under a general designation, such as "unknown" or "unascertained" persons.See 43 Words and Phrases (2004) ("unascertained persons," "unknown claimants," "unknown defendants," "unknown heirs," "unknown owners"); see e.g. Rush v. Hubbart,393 Ill. 228, 65 N.E.2d 681 (1946) (In action to quiet title to property, all persons who had or might have had an interest in property were properly made parties defendant and were properly before the court under the designation and style of "unknown owners"). Such a designation is specifically provided for by Rhode Island statutory law under G.L. 1956 § 34-16-9, which reads as follows:
 (a) The complaint may include as defendants in such cause, in addition to such persons as appear of record to have, or are known to have or to assert, or who may have or assert, some claim to, or interest in, the lands described in the complaint adverse to the plaintiffs right, title or interest therein:
 (1) All other persons unknown to, or unascertained by, the plaintiff, who claim, or may claim, any right, title or interest in such real estate; and
 (2) All others in privity with them or whose interest does or may constitute a cloud upon the title of the plaintiff thereto, as described in the complaint.
 (b) The complaint may include such unknown defendants in substantially the following language:
 "Also all other persons unknown and unascertained, claiming, or who may claim, any right, title, estate, lien, or interest in the real estate involved, which is, or might become, adverse to the plaintiffs right, title, or interest therein as alleged or which does or may constitute any cloud upon plaintiffs title thereto, as set forth in the complaint." *Page 38 
Here, the Belcher I Action Complaint does not specifically identify the Filippis or their predecessors in interest as defendants. Within the Belcher I Action Complaint, however, the plaintiffs do specifically seek relief against such a class of unknown persons that may claim an interest in the subject property pursuant to § 34-16-9. Paragraph EIGHTEENTH, subsection (b) of the Belcher I Action Complaint reads:
 WHEREFORE, inasmuch as your plaintiffs are afforded relief by virtue of Title 34, Chapter 16, and Title 44, Chapter 9 of the General Laws of Rhode Island, 1956, as amended, your plaintiffs pray:
 * * *
 (b) That the Defendants herein named and all persons claiming by, through or under any of them and all other persons unknown and unascertained be permanently enjoined from asserting any claim with respect to the real estate described in Paragraph FIRST hereof. (Defs. Mem. Ex. 28: Belcher I Action Complaint) (emphasis added).
Additionally, subsection (e) of Paragraph EIGHTEENTH requests that "any possible claims of all other persons and firms unknown and unascertained, claiming, or who may claim, any right, title, interest, estate or lien, which does or may constitute a cloud on said real estate described in Paragraph FIRST hereof, may be removed therefrom." Id. Lastly, the Belcher I Action Complaint seeks that an order of notice of pendency of the action be published relative to "all persons unknown, unascertained, and unascertainable, claiming, or who may claim, any right, title, interest, estate or lien in the real estate described in Paragraph FIRST" of the Complaint. Id. The record reflects that the Belcher I Action plaintiffs effectuated such publication upon all unnamed defendants in *Page 39 
1983 upon Order of Notice by the trial court in accordance with G.L. 1956 § 34-16-12.[32] (Defs. Mem. Exs. 47-48: Order of Notice and Certification of Publication.)
But despite the fact that the Belcher I Action Complaint sought relief against a broad class of unknown defendants that may have claimed a right or interest in the subject tea lots, the inclusion of the Filippis' predecessors as part of this class is dependant on such predecessors' relationship to the property in question.See Restatement (Second) Judgments § 43 (a judgment in an action that determines interests in real property "[c]onclusively determines the claims of the parties to the action regarding their interests" in the "property involved in theaction") (emphasis added); see also O'Brien v.Costello, 100 R.I. 422, 428-29, 216 A.2d 694, 698 (1966) (Parties include all persons who have a direct interest in subject matterof action and who have a right to control proceedings and appeal if one lies) (emphasis added).
As discussed, while the Belcher I Action Complaint cites the 1953 Tax Deed as the source of the Belchers' title, Paragraph FIRST of the Complaint enumerates multiple tea lots not originally identified in the 1953 Tax Deed from the Town. See Decision, Sec. I (B)(1), supra. Most of these Extra Lots were tea lots also designated in the 1970 Hines Deed. Cf. Defs. Mem. Ex. 28: Belcher I Action Complaint to Defs. Mem. Ex. 15: Hines Deed. Under the Filippis' theory, the Filippis' predecessors in interest thus would have held a competing claim to these Extra Lots at the time of the Belcher I Action, rendering the Filippis' predecessors as parties, albeit unnamed, to the Belcher I Action by virtue of *Page 40 
their possible claim or interest in the property listed on the face of the Belcher I Action Complaint. Hence, the Filippis' contend, their predecessors in interest were indeed subject to the Belcher I Action Judgment. See G.L. 1956 § 34-16-14 ("The judgment, when final, shall be conclusive against all persons served as herein required, both known and unknown, and whether under disability or not, and whether service was personal, by registered or certified mail, or by publication") (emphasis added).
Conversely, Smithfield Estates asks this Court to presume that the inclusion of the Extra Lots in the description of property within the Belcher I Action Complaint was merely a scrivener's error[33]
on the part of Edith Belcher and Sarah Hayes upon drafting, consequently excluding the Filippis' predecessors as parties subject to the Belcher I Action Judgment. Essentially, the parties here dispute the scope of the Judgments entered in the Belcher I Action in terms of the property affected. Thus, this Court must undertake an interpretation of the former Judgments to facilitate the resjudicata analysis at hand.
 a Scope of the Belcher I Action Judgments
Interpretation of judgments presents a question of law for the court. Harland v. Anderson Ranch Co.,321 Mont. 338, 92 P.3d 1160 (2004); State, PersonnelBd. v. Akers, 797 So.2d 422 (Ala. 2000). "As a general rule, judgments are to be construed like other written instruments, and the legal effect of a judgment must be declared in light of the literal meaning of the language used." 46 Am. Jur. 2d Judgments § 74 (citing Phoenix *Page 41 Windows, Inc. v. Viking Const., Inc.,88 Conn. App. 74, 868 A.2d 102 (2005), certification denied,273 Conn. 932, 873 A.2d 1001 (2005); Balius v. Gaines,908 So. 2d 791 (Miss. Ct. App. 2005), cert. denied, (Aug. 11, 2005);Bruce v. Steele, 215 W. Va. 460, 599 S.E.2d 883 (2004) andSosebee v. Sosebee, 896 So. 2d 557 (Ala. Civ. App. 2004)). If the language utilized is plain and unambiguous there is no room for construction or interpretation, and the judgment must be enforced according to its terms. See Blanchard v. Blanchard,484 A.2d 904, 906 (R.I. 1984) ("When the meaning of the decree is clear and unambiguous, reference cannot be made to material beyond the decree").
Should this Court determine an ambiguity to exist, there is room for construction and interpretation, and ascertaining the trial court's intention becomes the principal goal. This intention should be gathered from the judgment as a whole. SeeEnvironmental Procedures, Inc. v. Guidry,282 S.W.3d 602 (Tex. App. Houston 14th Dist. 2009), review denied, (Oct. 23, 2009); State v. Phillips,138 S.W.3d 224 (Tenn. Ct. App. 2003), appeal denied, (Mar. 22, 2004). Additionally, "[a] judgment must be construed in light of the situation of the court, what was before it, and the accompanying circumstances at the time of its rendition or entry." 50 C.J.S.Judgments § 742 (2009) (citations omitted). Accordingly, the pleadings, issues, and other circumstances of the matter should also be considered. See id. (citing Ball v. Maynard,184 N.C. App. 99, 645 S.E.2d 890 (2007), review denied,656 S.E.2d 591 (N.C. 2007); see also Nisenzon v.Sadowski, 689 A.2d 1037, 1048 n. 15 (R.I. 1997) (citing 46 Am. Jur. 2d Judgments § 97 (1994) ("a judgment which is ambiguous and uncertain may be read in connection with the entire record and construed accordingly")). *Page 42 
In regard to the Belcher I Action, the record reflects that the trial court entered two Judgments — a Consent Judgment entered on May 4, 1988 and the October 2, 1989 Judgment referred to in this Decision as the Belcher I Action Judgment. The Consent Judgment concerned only Defendants John M. D'Ambra, East Coast, Maine Development, Antoinetta D'Ambra, and Domestic Safe Deposit Company, and adjudged Edith Belcher and Sarah Hayes as fee simple owners of the subject tea lots by reason of adverse possession and by reason of the 1953 Tax Deed, enumerating each lot as set forth in Paragraph FIRST of the Belcher I Action Complaint, including the Extra Lots. (Pl. Suppl. Ex. 21: Consent Judgment.) The second Judgment, entitled Order and Judgment, appears to concern all other defendants in the Belcher I Action; namely, the Heirs at Law of John M. Hathaway, Leonard W. Hathaway, the Unknown Heirs of John M. Hathaway, and any "unknown persons" joined. (Pl. Suppl. Ex. 19: Belcher I Action Judgment.) As discussed, this second Judgment forever foreclosed the rights of redemption under the 1953 Tax Deed, adjudged Edith Belcher and Sarah Hayes as fee simple owners of the subject properties by virtue of adverse possession, and barred all claims by the named Defendants, any persons claiming by or through the named Defendants, and any unknown persons. Id. The Belcher I Action Judgment does not explicitly enumerate the specific lots at issue as did the Consent Judgment, but instead refers to the "real estate described in the complaint." Id.
This Court finds that an examination of the Judgments entered in the Belcher I Action produces an ambiguity as to the realty involved, such that, the scope of the Judgments cannot be determined in light of the literal meaning of the language employed.See Wise v. Watson,286 Ala. 22, 27, 236 So.2d 681, 686 (1970) ("The legal effect [of a *Page 43 
judgment] must be declared in light of the literal meaning of the language used"). The Belcher I Action Judgment entered in 1989 — which the Filippis' allege applies to them — specifically cites the 1953 Tax Deed, yet also refers to the "real estate described in the complaint." The Consent Judgment likewise refers to the 1953 Tax Deed, yet specifies the Extra Lots as property made subject of the dispute. As a result of these conflicting references, an ambiguity as to the scope of property covered by the Judgments is created that is reasonably susceptible to more than one interpretation. See McBurney v.Teixeira, 875 A.2d 439, 443 (R.I. 2005) ("[A]n agreement is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation.") Accordingly, this Court shall construe the Judgments entered in the Belcher I Action to effectuate the intent of the trial court in that action.
Such an interpretation begins with the Belcher I Action Complaint itself. In Paragraph FIRST of the Complaint, Edith Belcher and Sarah Hayes alleged that title to the subject property was acquired by virtue of the 1953 Tax Deed. (Pl. Suppl. Ex. 18: Belcher I Action Complaint.) The plaintiffs then inserted a legal description of the "described real estate" conveyed by the 1953 Tax Deed. It is within this description that the Belcher I Action plaintiffs include the Extra Lots; namely, lots not originally identified in the 1953 Tax Deed.[34] An examination and comparison of the 1953 Tax Deed and the Belcher I Action Complaint discloses that an error in transcription was indeed likely, resulting in the unintended inclusion of the Extra Lots.[35]
Moreover, given *Page 44 
the explicit reference to the 1953 Tax Deed in Paragraph FIRST and throughout the remainder of the Complaint, this Court finds that the 1953 Tax Deed was incorporated into the Complaint by reference, and thus the legal description set forth in the Deed itself controls.See Northern Indiana Gun Outdoor Shows, Inc. v. City ofSouth Bend, 163 F.3d 449 (7th Cir. 1998) (It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit generally trumps the allegations for purposes of a motion to dismiss);380544 Canada, Inc. v. Aspen Technology, Inc.,544 F.Supp.2d 199 (S.D.N.Y. 2008) ("Where the plaintiff's allegations are contradicted by a document that the complaint incorporates by reference, the document controls").
A review of the Belcher I Action record available to this Court further evinces the trial court's intent as to the extent of property affected upon entering final judgment. The Abstract and Report of Title Examiner submitted in connection with the Belcher I Action, while listing almost three-hundred (300) conveyances by John M. Hathaway, offers conclusions relative to only the realty identified in the 1953 Tax Deed. (Defs. Mem. Ex. 28: Title Report.) Additionally, a Notice of Disposal was entered and recorded subsequent to final judgment and refers to the 1953 Tax Deed. (Pl. Suppl. Ex. 21: Notice of Disposal.) The circumstances before the trial court and the issues raised by the litigation likewise influence this Court's construction of the Judgments entered in the Belcher I Action. See 50 C.J.S.Judgments §§ 742, 747 (2009) (citations omitted). The record reveals that the plaintiffs' impetus for initiating the Belcher I Action was Leonard W. Hathaway's attempted exercise of the right of redemption under the 1953 Tax Deed. (Pl. Suppl. Ex. 18: Belcher I Action Compl. ¶¶ 4, 8, 9, 10, 16.) Thus, examination of the *Page 45 
Belcher I Action Judgments as a whole, coupled with consideration of the Belcher I Action Complaint and other portions of the Belcher I Action record, indicates that the scope of the Judgments entered in that case was limited to the property listed within the 1953 Tax Deed and did not include the Extra Lots.
It should be noted that this Court is well aware of the attempt by Sarah Hayes to utilize the transcription error in the Belcher I Action Complaint to her advantage upon the filing of her Answer and Counterclaim in the Conti Action in 1990. (Defs. Mem. Ex. 29: Hayes Ans. and Counterclaim in Conti Action.) In her response in the Conti Action, Sarah Hayes specifically denied that Mr. Conti had any claim to the Extra Lots because she was the true owner (along with Edith Belcher) of such lots, and consequently counterclaimed for damages based on slander of title. Id. Sarah Hayes averred that her title to the Extra Lots stemmed from the Judgment and Notice of Disposal filed as a result of the Belcher I Action. Id.
However, the Conti litigation never progressed to a point at which the trial court was required to examine Sarah Hayes's claim to the Extra Lots or interpret the extent of the Belcher I Action Judgment. Thus, her subsequent actions have no bearing on this Court's interpretation at hand.[36]
It should also be noted that the Filippis argue that certain representations by Edith Belcher and Sarah Hayes in other court filings judicially estopp Smithfield Estates from now asserting the limited nature of the Belcher I Action Judgments. (Defs. Sur-Reply Mem. pp. 9-10.) However, the interpretation of a judgment lies within the province of the Court. Moreover, while the Filippis point to these other court filings and conclude *Page 46 
that judicial estoppel is applicable, no meaningful discussion or legal analysis is provided concerning the application of the doctrine in this context. See id. Thus, no further examination is required by this Court. See Wilkinson v.State Crime Lab. Comm., 788 A.2d 1129, 1132 n.l (R.I. 2002) (establishing that simply stating an issue on appeal without meaningful discussion or briefing constitutes a waiver of that issue because it does not assist the court in focusing on the legal question); see also Washington Village Country Club v.Island Green Golf, LLC, No. KC-05-0553, 2007 WL 2463802 (R.I. Super. Ct., Aug. 21, 2007) (Court deemed certain arguments inconsequential and not requiring discussion when insufficiently supported).
 b Effect upon Identity of Parties Analysis
Having determined that the Judgments entered in the Belcher I Action quieted title to only the Belcher Tea Lots originally conveyed to the Belchers via the 1953 Tax Deed, this Court must now resolve whether the Filippis' predecessors in interest were indeed "parties" to the Belcher I Action for purposes of resjudicata. As discussed, a judgment in an action that determines interests in real property "[c]onclusively determines the claims of the parties to the action regarding their interests" in the "property involved in the action." Restatement (Second)Judgments § 43. "The judgment determines the extent of the property interests of each person whose claims are within the scope of the adjudication and who is party to the litigation."Id. at cmt a. Therefore, unless the Filippis' predecessors claimed or may have claimed right, title or interest in any of the Belcher Tea Lots covered under the 1953 Tax Deed, such *Page 47 
predecessors would have no claims within the scope of adjudication to classify them as an "unknown" or "unascertained" party to the Belcher I Action.
As noted, two tea lots conveyed by the 1953 Tax Deed — Lots 454 and 502 — were also specified in the Hines Deed executed in 1970 by the Town and B. I. Realty. (Pl. Suppl. Ex. 16: 1953 Tax Deed; Defs. Mem. Ex. 15: Hines Deed.) Thus, at the time the Belcher I Action was initiated in 1982, the Filippis' predecessors in interest may have claimed a right, title or interest in those two lots.[37] See § 34-16-9. Consequently, the Filippis' predecessors fell within the class of unknown defendants in the Belcher I Action subject to the Superior Court's jurisdiction by virtue of service by publication and were subsequently bound by the Belcher I Action Judgment entered in 1989.[38]
Based on the above reasoning, this Court finds that the Belcher I Action Judgments quieted title to only the Belcher Tea Lots identified in the 1953 Tax Deed, that the Filippis' predecessors in interest had a competing claim to Lots 454 and 502 by way of the Hines Deed at the time the Belcher I Action was initiated, and that such predecessors were made party to the Belcher I Action as "unknown defendants" by virtue of general designation and publication. Thus, the Filippis' predecessors in interest were bound by the Belcher I Action Judgment.
Privity between Smithfield Estates and Edith Belcher and Sarah Hayes exists pursuant to a successive property relationship. Privity endures between the Filippis and *Page 48 
their predecessors in interest for the same reason. Accordingly, an identity of parties between this case and the Belcher I Action relative to the Filippis and Smithfield Estates exists for purposes of res judicata.
 ii Identity of Issues
The Filippis maintain that an identity of issues exists between this case and the Belcher I Action relative to Smithfield Estates' claims of adverse or constructive possession based on the acts of the Belchers and Sarah Hayes prior to 1989. Specifically, the Filippis argue that the Belcher I Action cleared title to the Extra Lots, most in which the Filippis claimed an interest under the Hines Deed, and that Edith Belcher and Sarah Hayes should have sought to clear title to the remaining Disputed Lots at that time.[39] The Filippis emphasize that the Belcher Tea Lots and the Disputed Lots do not comprise distinct contiguous pieces of property, but instead are "checker boarded" throughout Lake View Park. Thus, the Filippis contend, any claims now proffered by Smithfield Estates based on the possessory acts of the Belchers and Sarah Hayes prior to the Belcher I Action stem from the same transactions and occurrences that formed the basis of the Belcher I Action Judgment and should be here barred by the doctrine of res judicata.
Smithfield Estates contends otherwise, arguing that an analysis of the claims in question discloses no identity of issues between the Belcher I Action and the present litigation sufficient to invoke the preclusive effects of res judicata. In particular, Smithfield Estates maintains that application of the factors utilized by Rhode Island *Page 49 
courts, as adopted from the Restatement (Second)Judgments, fails to reveal a common nucleus of operative facts between Smithfield Estates' present claims and the causes of action at issue in the Belcher I Action. Smithfield Estates points to the Belcher I Action Complaint itself, maintaining that the allegations within the Complaint confirm that any issues raised in the Belcher I Action were limited to those related solely to the tea lots transferred by the 1953 Tax Deed and falsely redeemed and conveyed by alleged heir Leonard W. Hathaway. Smithfield Estates avers that the Belcher I Action proceeded against only those defendants who purported to have an interest in such parcels. Thus, Smithfield Estates contends, the matters raised by the Belcher I Action Complaint constitute a transaction distinct from any claim or right Edith Belcher and Sarah Hayes had over parcels located within Lake View Park apart from those transferred by the 1953 Tax Deed.
As noted, this Court utilizes the approach set forth in Section 24 of the Restatement (Second) Judgments when ascertaining whether a claim could have been raised for purposes of finding an identity of issues. See Elgabri,681 A.2d at 275-78; see also Bossian,991 A.2d at 1027, Lennon, 901 A.2d 592; DiBattista, 808 A.2d 1086.[40] "The Restatement recommends that the doctrine of res judicata be applied to those matters actually litigated between parties, as well as those that are derived from a `series of connected transactions.'" Elgabri, 681 A.2d at 276 (citing Restatement (Second) Judgments § 24). In general, the expression "transaction or series of transactions" connotes a "natural grouping or common nucleus of operative facts." Restatement (Second) Judgments § 24 cmt. b. Hence, "[u]nder this rule, all claims arising from the *Page 50 
same transaction or series of transactions which could have properly been raised in a previous litigation are barred from a later action." DiBattista, 808 A.2d at 1086. "Although a set of facts may give rise to multiple counts based on different legal theories, if the facts form a common nucleus that is identifiable as a transaction or series of related transactions, then those facts represent one cause of action." Apparel Art Intern., Inc. v.Amertex Enterprises Ltd., 48 F.3d 576, 583-84 (1st Cir. 1995).
As set forth in the Restatement and adopted by the Rhode Island Supreme Court,
 [w]hat factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. Restatement (Second) Judgments § 24 sub. 2; Elgabri, 681 A.2d at 276.
Notwithstanding the satisfaction of the general preclusion rules, the preclusive effect of res judicata may not be applied in certain situations based on the invocation of one of several exceptions[41] recognized by the Restatement and adopted by Rhode Island courts. *Page 51 See Restatement (Second) Judgments § 26; seealso Plunkett v. State, 869 A.2d 1185 (R.I. 2005);Elgabri, 681 A.2d 271. While a judgment on a question of title or right to property is conclusive in subsequent litigation involving the same property, such a judgment is not ordinarily conclusive of title or rights to other property, 50 C.J.S.Judgments § 1089, unless claims involving the other property arise from the same transaction or series of connected transactions. Restatement (Second) Judgments § 43 cmt. c.
This Court must determine, therefore, whether the facts that underlie Smithfield Estates' claims based on its predecessors' adverse or constructive possession arise from the same nucleus of operative facts as those that were adjudicated by the prior Judgments in the Belcher I Action. Keeping the Restatement factors employed by Rhode Island courts in mind, this Court first turns to Smithfield Estates' allegations at issue. In its Complaint, Smithfield Estates alleges that in addition to owning and occupying the Belcher Tea Lots, Edith Belcher and Sarah Hayes have occupied and maintained several hundred additional Lake View Park tea lots[42] "in a manner that has been actual, open, notorious, hostile, under claim of right, continuous and exclusive for a period of time well in excess of ten (10) years. . . ." (Pl. Mem. Ex. 2: Compl. ¶ 18.) Smithfield Estates details this possession further, alleging that Edith Belcher, Sarah Hayes, and their predecessors have continuously maintained their home and driveway on the claimed *Page 52 
parcels, as well as landscaped, cultivated and otherwise utilized and cared for the land in a manner adverse to all other persons.Id. at ¶ 19.
The Belcher I Action Complaint alleges "open, adverse, exclusive, continuous and uninterrupted possession and enjoyment [of the Belcher Tea Lots] since July 19, 1950." (Pl. Suppl. Ex. 19: Belcher I Action Compl.) Clearly, the facts underlying both claims are related in time. Many of the alleged acts of possession by the Belchers and Sarah Hayes relative to the Belcher Tea Lots occurred over the same time span as the alleged acts within the Disputed Lots now claimed by Smithfield Estates. The facts are also related in space, in that the tea lots at issue in the Belcher I Action and the tea lots now claimed by Smithfield Estates lie within the bounds of the forty-eight (48) acre Lake View Park. Notably, the groupings of tea lots involved in the two actions do not comprise two separate and distinct parcels. Conversely, the tea lots are intermingled amongst each other throughout Lake View Park. See Pl. Mem. Ex. 1: Lake View Park Plat Map.
In examining the factual origin and motivation behind the causes of action in the Belcher I Action and the present case, a distinction between the claims is more readily discerned. As discussed, the allegations set forth in the Belcher I Action Complaint indicate that the plaintiffs' primary motivation for initiating that action was the improper attempt by Leonard W. Hathaway to redeem and convey interest to the Belcher Tea Lots. (Pl. Suppl. Ex. 18: Belcher I Action Compl. ¶¶ 1, 9, 10, 16.) The named defendants in the Belcher I Action included only those parties who purportedly received a property interest through the chain of title originating with Leonard W. Hathaway's attempted redemption, and those parties who may have held an interest as an heir of John M. *Page 53 
Hathaway.[43] While the Belcher I Action plaintiffs also alleged adverse possession for a period of thirty-two (32) years, the motivation and origin of the claim stemmed from a desire to quiet title to the Belcher Tea Lots in light of Leonard W. Hathaway's creation of potential competing claims.
Here, however, Smithfield Estates seeks to quiet title to all Lake View Park tea lots located to the west of Douglas Pike[44] by virtue of its predecessors' adverse and constructive possession of the lots, as well as by virtue of the multiple deeds described within the Complaint. (Second Am. Compl. pp. 80-83.) Nearly seven hundred (700) defendants are named in the present action as potentially interested parties. Smithfield Estates bases its claims on the possessory acts of multiple predecessors over the entirety of Lake View Park, not just the acts of the Belchers. The origin of Smithfield Estates' claims at issue here extends beyond the origin of the claims set forth by Edith Belcher and Sarah Hayes in the Belcher I Action.
Given the complicated and lengthy history of this litigation, of great import to this Court's analysis is whether the facts form a convenient trial unit. As the comments to the Restatement explain, "the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first." Restatement (Second) Judgments § 24 cmt. b. Indeed, the witnesses and evidence supporting the alleged adverse and constructive possession of the Belchers and Sarah Hayes over the entirety of Lake View Park would tend to overlap with any witnesses and evidence that would have been presented in support of their *Page 54 
claims over the Belcher Tea Lots had the Belcher I Action proceeded to trial. However, this Court is mindful of the case-by-case approach required in conducting the "transactional" analysis.See id. ("The expression `transaction, or series of connected transactions,' is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases.") The factual underpinnings of this case and the Belcher I Action are complex and unique at the very least. A mere glance at the filings, title reports, discovery and procedural history of the instant matter and prior tea lot litigation reveals that quieting title to the Lake View Park tea lots has been far from convenient.[45] Edith Belcher and Sarah Hayes — seeking to defend their interest in the Belcher Tea Lots when challenged by the acts of Leonard W. Hathaway — would have encountered a cumbersome action had they extended their claims for land beyond what was conveyed by the 1953 Tax Deed. Hence, the facts of the instant action and the facts of the Belcher I Action would not have created a convenient trial unit in the Belcher I Action, particularly given the motivation and origin of Edith Belcher and Sarah Hayes's claims at that time.
Moreover, treatment of the facts of this case and of the Belcher I Action as a single trial unit does not conform to the parties' expectations regarding the first suit's preclusion of the second suit. While the Filippis maintain that they presently possess an expectation of preclusion as to any claims over the Disputed Lots based on the possessory acts of the Belchers and Sarah Hayes prior to 1989, and have submitted the Affidavit of Steven Filippi[46] as to such, the expectation inquiry centers on the parties' expectations at *Page 55 
the time the first suit. See Russo v. Baxter HealthcareCorp., 919 F. Supp. 565, 570 (D.R.I. 1996). As the Filippis have urged, and as this Court has found, the Filippis' predecessors in interest were indeed parties to the Belcher I Action as "unknown" claimants served by publication. However, the Filippis' predecessors never entered an appearance in the Belcher I Action to defend any claim or right to the Belcher Tea Lots, to Lots 454 and 502, or to the Extra Lots listed in error. The Filippis cannot now argue that their predecessors in interest held an expectation of preclusion relative to adverse or constructive possession claims over any of the Disputed Lots given their predecessors' complete lack of involvement in the Belcher I Action.
Based on the pragmatic transactional analysis here employed, this Court finds that the instant quiet title claim, although involving similar evidence represented in the Belcher I Action, did not arise out of the same factual grouping that formed the basis of the claims in the prior proceeding. While certain facts now alleged by Smithfield Estates in support of its claim seemingly relate to facts underlying the Belcher I Action in regard to time and space, the distinctive origin and motivation behind the plaintiffs' claims in the prior proceeding weigh heavily in favor of a finding of "no identity." Furthermore, the factual groupings underpinning this case would not have formed a convenient trial unit in the Belcher I Action, nor would the Filippis have expected the trial court to treat these facts as such, given the Filippis lack of appearance as active defendants in that prior proceeding. Consequently, the adverse possession claims asserted in the earlier action by Sarah Hayes and Edith Belcher and those asserted by Smithfield Estates in the instant action do not derive from a common nucleus of operative facts. Accordingly, this Court *Page 56 
finds that an identity of issues necessary to invoke the preclusive effect of res judicata does not exist. SeeGonzalez v. Banco Cent. Corp.,27 F.3d 751, 755 (1st Cir. 1994).
This Court finds Sarah Hayes and Edith Belcher were not required to assert their claims to additional Lake View Park tea lots apart from those identified in the 1953 Tax Deed during the Belcher I Action. Hence, the Belcher I Action Judgment does not preclude Smithfield Estates from presenting its claim to the remaining Lake View Park tea lots based on the possessory acts of the Belchers and Sarah Hayes.[47] The Filippis' motion for partial summary judgment as to the effect of the Belcher I Action Judgment is denied, accordingly.
 2 The Conti Action
The Filippis aver that any claims by Smithfield Estates based on the alleged acts of Mr. Conti prior to the Conti Action Judgment are barred by res judicata, as well as any claims based on the Conti Deed. The Filippis maintain that a sufficient identity of issues and parties exists between this action and the Conti Action, and that a final judgment on the merits entered in the Conti Action when Mr. Conti's claims were dismissed with prejudice. Specifically, the Filippis contend that Smithfield Estates cannot utilize the Conti Deed to support a claim of title or color of title because that was the exact basis of Mr. Conti's claims in the Conti Action. The Filippis also argue that Smithfield Estates is precluded from basing any claims on the possessory acts of Mr. Conti because any *Page 57 
alleged adverse possession would have been part of the transaction or series of transactions underpinning the Conti Action.
In opposing this partial summary judgment motion, Smithfield Estates does not offer a res judicata analysis, but instead directs this Court to a prior determination by the trial justice in the Surabian Action. Smithfield Estates contends that in the Surabian Action, the Rhode Island Superior Court considered a summary judgment motion filed by Mr. Surabian and Marion Filippi, in which the two parties argued that Mr. Conti should be barred from defending his interest in any tea lots claimed by Mr. Surabian based on res judicata principles. Smithfield Estates avers that after considering the motion, the trial judge denied the motion based on a lack of identity of issues and parties. Thus, Smithfield Estates contends, judicial comity mandates this Court adopt the prior decision of the trial justice in the Surabian Action as to the applicability of res judicata.
In their reply memoranda, the Filippis maintain that the trial justice in the Surabian Action never ruled on the summary judgment motion as it pertained to Marion Filippi.
 i The Trial Judge's Decision in Surabian Action
As a preliminary matter, this Court shall clarify the existing confusion as to what determinations were made by the trial justice in the Surabian Action relative to the summary judgment motion apparently filed in that matter. As discussed, Mr. Surabian initiated the Surabian Action in 1997 to quiet title to a southeast portion of Lake View Park based on his alleged actual occupation of the lots for over ten (10) years. Marion Filippi, Mr. Conti, Edith Belcher and Sarah Hayes, among others, were named as *Page 58 
defendants in the Surabian Action. Mr. Conti filed counterclaims and cross-claims seeking to quiet title to fifteen (15) of the tea lots claimed by Mr. Surabian.
The record reflects that on August 7, 1997, Mr. Surabian filed a "Motion for Partial Summary Judgment against Defendant Crescenzo Conti Relating to Fifteen (15) Specific Lots." (Pl. Suppl. Ex. 61: Mr. Surabian's Memorandum in Support of Motion.) Mr. Surabian posited that Mr. Conti's counterclaim relative to the fifteen (15) lots was barred by res judicata because Mr. Conti had claimed those same lots in his unsuccessful attempt to quiet title in the Conti Action. On September 23, 1997, co-defendant Marion Filippi filed an "Objection, in part, to Plaintiff's Motion for Partial Summary Judgment against Defendant Crescenzo Conti." (Pl. Suppl. Mem. Ex. 62.) From the memorandum submitted in connection with that objection, it appears that while Marion Filippi agreed that res judicata barred Mr. Conti's claim for the parcels, she was opposed to Mr. Surabian's alternate request for relief in the motion based on adverse possession. Seeid. Marion Filippi was not a movant for purposes of the motion.
The record discloses that on Oct. 7, 1997, a Superior Court justice denied Mr. Surabian's motion for partial summary judgment against Mr. Conti after a hearing on the matter.[48] The Order explicitly states that "upon due consideration it is found that plaintiff has failed to establish the required identities of parties and issues to support his claim that the defendant's claim is barred by the doctrine of resadjudicata" and that "plaintiff's motion for summary judgment is denied." (Pl. Suppl. Ex. 63: Order) (emphases added). Thus, it is clear from Mr. Surabian's motion and from the Court's Order that the Court found no identity of parties or issues as between Mr. Conti and Mr. Surabian. While the trial justice's reasoning is not stated within her Order, part of this finding was likely *Page 59 
premised on the fact that Mr. Surabian was not a named party to the Conti Action.[49] The trial justice did not rule on the issue ofres judicata relative to any claims Mr. Conti may have held against Marion Filippi. Accordingly, Smithfield Estates' judicial comity argument in this action is therefore misplaced.
 ii Final Judgment on the Merits
The Conti Action was dismissed with prejudice in January of 1993 for failure to file a title abstract in accordance with a previous stipulation to comply with § 34-16-2. (Defs. Mem. Ex. 29: Orders and Final Judgments in Conti Action.) The Rhode Island Supreme Court subsequently upheld this dismissal. SeeConti, 659 A.2d 117. Pursuant to Rhode Island Superior Court Rule of Civil Procedure 41(b)(3), an involuntary dismissal under Rule 41(b) operates as an adjudication upon the merits unless the court otherwise specifies in its order. Kent, Rhode Island CivilProcedure and Commentaries § 41:4 (2006). Rule 41(b)(3) also provides that any dismissal not provided for in Rule 41, other than for lack of jurisdiction or for improper venue or for lack of an indispensable party, operates as an adjudication on the merits.Id. As stated within the Order granting final judgment in the Conti Action, and in accordance with Rule 41(b)(3), the dismissal of the Conti Action, upheld upon appeal, was an adjudication on the merits. See Defs. Ex. 29: Conti Action Order) ("The plaintiff's claims in this action as to all the defendants are dismissed on the merits.") *Page 60 
 iii Identity of Parties
Unlike the situation presented in the Belcher I Action, the Filippis' predecessors in interest — Paul Filippi, Sr. and Marion Filippi — were indeed named parties in the Conti Action. (Defs. Mem. Ex. 29: Conti Action Complaint.) The successive property relationships created subsequent to the Conti Action produces the necessary privity between the Filippis and Paul Filippi, Sr. and his wife. See O'Brien, 100 R.I. at 429, 216 A.2d at 698;see also Restatement (Second) Judgments § 43. Privity exists between Smithfield Estates and Mr. Conti for the same reason. Hence, the identity of parties requirement is satisfied.
 iv Identity of Issues
Utilizing the transactional approach as set forth above, this Court turns to the factual foundations of Mr. Conti's claims in the Conti Action and Smithfield Estates' claims in this case. In support of its effort to quiet title, Smithfield Estates alleges that it is now the owner by deed of all right, title and interest in and to lots within Lake View Park by virtue of Mr. Conti's conveyance of such interests to Smithfield Estates in 2002. (Second Am. Compl. ¶ 24, 25, 33.) This deed from Mr. Conti to Smithfield Estates specifically conveys any and all interest in Lots 1 through 987 — not just those lots conveyed in the Conti Deed (which are the same lots claimed by the Filippis under the Hines Deed). (Pl. Suppl. Ex. 32: Quitclaim Deed dated Sept. 19, 2002.) Thus, it is apparent that Mr. Conti conveyed to Smithfield Estates any interests created by the Conti Deed and any interests created by virtue of his alleged adverse possession. While *Page 61 
Smithfield Estates does not detail Mr. Conti's alleged adverse possession in its Complaint as it did with the Belchers, Smithfield Estates does generally allege that it holds a fee simple interest in all of Lake View Park by reason of its predecessors' adverse possession. Id. at Prayer for Relief ¶ 1.
In the Conti Action, Mr. Conti sought to quiet title to the Lake View Park and Chestnut Knoll lots conveyed to him by Alexis Proctor in 1976 by virtue of the Conti Deed. (Defs. Mem. Ex. 29: Conti Action Compl.) In his complaint, Mr. Conti made no specific claim over those lots based on satisfaction of the statutory requisites for adverse possession, but did state that he "acted as owner including but not limited to taking responsibility for the payment of taxes." Id. at ¶ 4. During Mr. Conti's 1988 deposition in the Conti Action, Mr. Conti did testify as to some of his acts as an owner, including the "keeping up" of a road, cleaning up the land, keeping people off the land, preventing the cutting of wood, and walking the property, from the point of time at which the Conti Deed was recorded. (Defs. Mem. Ex. 44: Conti Dep. pp. 19-20.)
Here, the facts underlying Smithfield Estates' claims and the facts of the Conti Action not only arise from a common nucleus of operative facts, but are essentially identical. First, any claim now proffered by Smithfield Estates involving the validity of the Conti Deed is the same claim set forth by Mr. Conti in the Conti Action and is therefore barred by res judicata. SeeBossian, 991 A.2d at 1027 (The doctrine of resjudicata serves as an absolute bar to a second cause of action where there exists identity of parties, identity of issues, and finality of judgment in an earlier action). Second, any claims by Smithfield Estates based on Mr. Conti's adverse or constructive possession from 1976 until the Conti Action in 1987 arise from the same "transaction" as Mr. *Page 62 
Conti's claim manifesting from the Conti Deed. The facts are related in time and space in that Mr. Conti alleged to have taken possessory acts of ownership over the same parcels identified in the Conti Deed. (Defs. Mem. Ex. 29: Conti Action Compl. ¶ 4; Ex. 44: Conti Dep. pp. 19-20.) The facts also relate in origin and motivation since Mr. Conti was prompted to quiet title based on the execution the Conti Deed — the point at which he alleged his acts of ownership to have begun.
Furthermore, any claims by Smithfield Estates based on Mr. Conti's adverse possession of the tea lots named in the Conti Action (those claimed by the Filippis via the Hines Deed) would have formed a convenient trial unit with his claim to quiet title by deed.[50] At the time of the Conti Action in 1987, Mr. Conti could have claimed adverse possession for the statutorily-required period of ten (10) years. In his deposition, Mr. Conti testified to have partaken in such acts since 1976. Moreover, the Filippis' predecessors in interest were designated and active defendants in the Conti Action and would have expected any allegations of adverse possession by Mr. Conti to be considered along with his claim over the Disputed Lots by virtue of deed. In essence, allegations concerning Mr. Conti's adverse possession merely constitute another legal theory upon which Mr. Conti may have quieted title to the same lots he claimed under the Conti Deed. See Restatement (Second)Judgments cmt. a ("The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories . . . that may be available to the plaintiff"). *Page 63 
This Court finds that Mr. Conti's primary theory of title by deed, and Smithfield Estates' present theory of Mr. Conti's adverse possession of the Disputed Lots are clearly a "factual grouping" constituting a series of transactions for purposes of claim preclusion. The rights Smithfield Estates asserts in the present action based on Mr. Conti's possessory acts over the Disputed Lots prior to the filing of the Conti Action are part of a single claim. This claim was merged into the final judgment in the Conti Action. Accordingly, Smithfield Estates is precluded from claiming interest in the Disputed Lots based on the Conti Deed or Mr. Conti's alleged adverse possession prior to the filing of the Conti Action in 1987.[51] The Filippis' motion for partial summary judgment as to the effect of the Conti Action Judgment is granted, accordingly.
 B Judicial Estoppel
The Filippis' second motion for partial summary judgment also seeks to limit the scope of Smithfield Estates' adverse and constructive possession claims based on the acts of Mr. Conti. Pointing to conflicting testimony by Mr. Conti in the Conti Action and the Surabian Action concerning his possessory acts over the Lake View Park tea lots, the Filippis argue that Smithfield Estates should be required to maintain the least beneficial of Mr. Conti's contradictory representations regarding any alleged acts of adverse possession. Specifically, the Filippis maintain that Mr. Conti testified (1) during the Conti Action as to his possessory acts beginning in 1976, (2) in the appeal of the Conti Action as to possessory acts beginning in 1987, and (3) in the Surabian Action as to *Page 64 
possessory acts beginning in 1975. See Defs. Mem. Ex. 44: Conti Dep. pp. 19-20; Ex. 33: Conti Appellate Memorandum pp. 6-7; Ex. 30: Conti Counter/Cross-claim in Surabian Action Count II, ¶ 8.) The Filippis posit that Mr. Conti's position changed so frequently in order to set up the most favorable set of facts in each action to support a ripened adverse possession claim. Thus, the Filippis contend, judicial estoppel presently bars any claims by Smithfield Estates based on Mr. Conti's acts of adverse possession prior to 1987 — the least beneficial representation made by Mr. Conti.
On the contrary, Smithfield Estates argues that judicial estoppel may not be applied in this instance because Mr. Conti's assertions were neither unequivocal nor persuasive to the courts. Smithfield Estates further contends that neither the Rhode Island Supreme Court nor the Rhode Island Superior Court relied upon Mr. Conti's assertions in support of their respective decisions. Lastly, Smithfield Estates avers that the Filippis have suffered no prejudice as a result of Mr. Conti's conflicting positions.
This Court's determination — that Smithfield Estates' adverse and constructive possession claims based on the acts of Mr. Conti prior to the initiation of the Conti Action in 1987 are barred by resjudicata — effectively renders the Filippis' judicial estoppel argument moot. However, in an effort to resolve as many legal issues as possible for the parties in this case, the Court will address the judicial estoppel arguments here presented.
The Rhode Island Supreme Court recognizes the principle of judicial estoppel. See e.g. D H TherapyAssociates v. Murray, 821 A.2d 691, 693-94 (R.I. 2003);Gross v. Glazier, 495 A.2d 672, 675 (R.I. 1985). As a general rule, "the doctrine of judicial estoppel precludes a party from asserting a position in one proceeding that is contrary to a *Page 65 
position it asserted in an earlier proceeding." Dunellen LLC v.Getty Properties Corp., 557 F. Supp. 2d 263, 268 (D.R.I. 2008) (citing GE HFS Holdings, Inc. v. National Union Fire InsuranceCo. of Pittsburgh, PA, 520 F. Supp. 2d 213 (D.Mass. 2007)). The doctrine is "driven by the important motive of promoting truthfulness and fair dealing in court proceedings." D HTherapy Assoc, 821 A.2d at 693.[52] "Because the rule is intended to prevent `improper use of judicial machinery,' . . . judicial estoppel `is an equitable doctrine invoked by a court at its discretion.'" New Hampshire,532 U.S. at 750, 121 S. Ct. at 1815 (quoting Konstantinidis v.Chen, 626 F.2d 933, 938 (D.C. Cir. 1980) and Russell v.Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)).
"Of utmost importance in determining whether to apply the doctrine of judicial estoppel is whether the `party seeking to assert an inconsistent position would derive an unfair advantage . . . if not estopped.'" Gaumond, 909 A.2d at 519 (citing NewHampshire, 532 U.S. at 751, 121 S. Ct. at 1815). Courts also consider whether the party who has taken an inconsistent position had "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create `the perception that either the first or the second court was misled.'" New Hampshire,532 U.S. at 750, 121 S. Ct. at 1815 (quoting Edwards v. AetnaLife Insurance Co., 690 F.2d 595, 599 (6th Cir. 1982)). However, "[a]bsent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations and thus poses little threat to judicial integrity."Id. at 750-51, 121 S. Ct. at 1815. *Page 66 
The United States District Court for the District of Rhode Island, guided by the First Circuit Court of Appeals, considers similar factors in a judicial estoppel analysis:
 First, the legal or factual assertion made in the earlier proceeding must be "directly inconsistent" with the assertion made in the current proceeding. Dunellen LLC, 557 F. Supp. 2d at 269 (citing GE HFS Holdings, 520 F. Supp. 2d at 223 (internal quotation marks and citation omitted)). That assertion must have also been "unequivocally asserted" in the earlier proceeding. Id. (citing Brewer v. Madigan, 945 F.2d 449, 455 (1st Cir. 1991)). Second, the party must have been successful in persuading the court to adopt the earlier position. Id. (citing GE HFS Holdings, 520 F. Supp. 2d at 223-24).
The First Circuit also considers prejudice and unfair advantage in such an analysis; however, harm to the opposing party "is not an invariable prerequisite to judicial estoppel." GE HFSHoldings, 520 F. Supp. 2d at 224.
This Court finds that the application of judicial estoppel as proffered by the Filippis is not appropriate in this situation. While Mr. Conti's assertions as to the origin date of his alleged adverse possession over the Disputed Lots have been inconsistent throughout the series of tea lot litigation, Mr. Conti was never successful in persuading a court to accept any of his positions. Mr. Conti's action was dismissed for failure to submit a title report and was upheld for the same reasoning. The testimony offered by Mr. Conti regarding his alleged adverse possession did not "influence" the final dispositions in those matters. SeeD H Therapy Assoc., 821 A.2d at 694. Absent such persuasion, there lies no "risk of inconsistent court determinations." NewHampshire, 532 U.S. at 750-51, 121 S. Ct. at 1815.
Moreover, Mr. Conti did not benefit from his assertions in either the Conti Action or the Surabian Action. Consequently, it cannot now be said that Smithfield Estates urges an inconsistent assertion to gain an advantage at the Filippis' expense. This Court *Page 67 
discerns no resulting prejudice to the Filippis by withholding the application of estoppel under these circumstances. The Filippis' partial summary judgment motion concerning the application of judicial estoppel is denied accordingly.
 C Marketable Record Title
The Filippis also seek partial summary judgment on Smithfield Estates' claim based on Edith Belcher and Sarah Hayes' acquisition of marketable record title over the Disputed Lots pursuant to G.L. 1956 § 34-13.1-1 et seq., the Rhode Island Marketable Record Title Act ("MRTA"). In its Complaint, Smithfield Estates avers that Edith Belcher and Sarah Hayes, by their own acts and by the acts of their predecessors, acquired title to the Disputed Lots by adverse and constructive possession, entitling Edith Belcher and Sarah Hayes to the statutory "presumption in law and in fact of a lost grant" to the Disputed Lots, "properly executed and delivered, effective to cure any defects in title and/or to remove the cloud thereon." (Second Am. Compl. ¶ 19.) Smithfield Estates also asserts that Edith Belcher and Sarah Hayes have occupied the Belcher Tea Lots and the Disputed Lots pursuant to the Downes Deed, thus acquiring marketable record title under § 34-13.1-5 etseq..[53] Id. The Filippis argue, however, that the Belchers and Sarah Hayes have never been the record owners of any possessory interest in the Disputed Lots. Thus, the Filippis contend, Smithfield Estates has no claim over the Disputed Lots based on the Belchers and Sarah Hayes' alleged marketable record title as a matter of law. *Page 68 
In examining this claim, this Court looks to the entire statutory scheme governing marketable record title. The MRTA "purports to extinguish an interest or claim in real estate under certain circumstances." Bitting v. Gray, 897 A.2d 25, 33 (R.I. 2006). "The declared purpose of the act is to facilitate and simplify land title transactions; and as such, the Legislature has declared that the act should be construed liberally to effectuate this purpose." Id (citing § 34-13.1-10). The MRTA provides
 "[a]ny person having legal capacity to own land in this state, who has an unbroken chain of title to any interest in land for forty (40) years or more, shall be deemed to have a marketable record title to that interest, subject only to the matters stated in § 34-13.1-3. A person has such an unbroken chain of title when the land records of the town in which the land is located disclose a conveyance or other title transaction, of record not less than forty (40) years at the time the marketability is to be determined, which conveyance or other title transaction purports to create such interest in land, or which contains language sufficient to transfer the interest, either in the person claiming that interest, or some other person from whom, by one or more conveyances or other title transactions of record, the purported interest has become vested in the person claiming the interest; with nothing appearing of record, in either case, purporting to divest the claimant of the purported interest."
Sec. 34-13.1-2. To vest marketable record title, the statute clearly requires a "root of title"[54] stemming from a "conveyance or other title transaction" of record disclosed by the municipality's land evidence records. Id
Here, the Filippis do not dispute that Smithfield Estates may set forth MRTA claims based on any interests conveyed to the Belchers by the 1953 Tax Deed or the Downes Deed, executed in 1951. However, the Filippis take issue with Smithfield Estates' apparent claim to the Disputed Lots based on the Downes Deed as "root of title" *Page 69 
because the Filippis believe the Downes Deed did not convey any land within Lake View Park. In its Complaint, Smithfield Estates alleges that "in addition to owning and occupying the Belcher [Tea] Lots, [Edith] Belcher and [Sarah] Hayes have occupied and maintained the [Disputed Lots] in a manner that has been actual, open, notorious, hostile, under claim of right, continuous and exclusive for a period of time well in excess of ten (10) years and pursuant to the Deedfrom Margaret Downes." (Second Am. Compl. ¶ 18) (emphasis added). Additionally, Smithfield Estates alleges that Edith Belcher and Sarah Hayes occupied the Belcher Tea Lots and the Disputed Lots "pursuant to said Warranty Deed from Margaret Downes." Id. at ¶ 19.
Based on the record before the Court, the Filippis' motion for partial summary judgment regarding Smithfield Estates' claims for marketable record title over the Disputed Lots pursuant to the MRTA must be denied. The evidence submitted indicates that a genuine issue of material fact exists as to the scope of the Downes Deed. While the Downes Deed does identify "Lake View Park Plat" as a southern boundary of the Downes Land, the testimony of Sarah Hayes and the maps submitted in connection with the parties' briefs indicate that some of the Downes Land, including the Belcher Homestead, is situated within the bounds of Lake View Park.See Pl. Suppl. Ex. 14: Downes Deed dated Sept. 28, 1951; Pl. Suppl. Ex. 22: Dep. of Sarah Hayes at pp. 12-13; seealso Defs. Mem. Ex. 4: Smithfield GIS Overview Map. If the Downes Deed actually concerned any of the Disputed Lots, Smithfield Estates may be able to prove marketable record title to such lots at trial.
Moreover, the Filippis seek a determination that is too narrow in scope given the multitude of deeds at issue in this controversy. Smithfield Estates submits to this Court *Page 70 
numerous deeds that it has acquired concerning the Lake View Park tea lots. Some of these deeds identify specific Disputed Lots, some specify "proposed roads," and others concern whatever interests the grantor possessed in Lake View Park at the time of conveyance.[55]
Based on the record presently before it, this Court is neither prepared nor willing to assess any potential MRTA claims that Smithfield Estates may hold based on these additional chains of title.
This Court cannot determine that Smithfield Estates' claims based on the ripening of marketable record title are precluded as a matter of law. The Filippis' motion for partial summary judgment as to this issue is denied.
 D The Filippis' Counterclaim
Before considering the Filippis' fourth motion for partial summary judgment on Smithfield Estates' claims relative to adverse and constructive possession of the Disputed Lots, this Court will address Smithfield Estates' motion for summary judgment concerning the Filippis' counterclaim in this action. In their counterclaim, the Filippis seek a determination that they are the fee simple owners of the Disputed Lots by virtue of the Hines Deed and by adverse possession.[56] (Pl.'s Mem. Ex. 3: Filippi Counterclaim ¶¶ 3, 4, 5, 10.) Challenging both the validity of the Hines Deed and the Filippis' ability to satisfy the elements of adverse possession, Smithfield Estates contends no genuine issue of material fact exists as to the Filippis' lack of ownership interest in the Disputed Lots, thereby entitling Smithfield Estates to judgment as a matter of law. The Filippis contend *Page 71 
otherwise and likewise move for summary judgment on their counterclaim, maintaining that no disputed issue of fact exists as to the legitimacy of the Filippis' title by deed or by adverse or constructive possession.
 1 By Deed
Smithfield Estates avers that the Filippis cannot establish title to the Disputed Lots based on the Hines Deed as a matter of law. Specifically, Smithfield Estates maintains that Mr. Hines and his wife held no interest, right or title at the time of conveyance to B. I. Realty, as evidenced by the Hines Affidavit and Mr. Hines' deposition testimony elicited during the Conti Action. See
Pl.'s Mem. Ex. 7: Hines Aff.; Ex. 8: Hines Dep. p. 23. As discussed, in the Hines Affidavit, Mr. Hines and his wife attested to their lack of ownership interest in the Disputed Lots (and Filippi Chestnut Knoll Lots) at the time they executed the Hines Deed in 1970 and explained the purpose behind the conveyance as vesting "color of title" to those tea lots in B. I. Realty. (Pl. Mem. Ex. 7: Hines Aff.) Moreover, deposition testimony by both Mr. Hines and Paul Filippi, Sr. indicate that the parties to the Hines Deed intended the Hines Deed to substitute for a tax sale because such a sale was deemed impractical by Town officials.See Defs. Ex. 41: Hines Dep. pp. 37-38, 48-49, 52; seealso Filippi Sr. Dep. pp. 5-8. Based on these admissions, Smithfield Estates contends that the Hines Deed is void as an unlawful tax sale, fraudulent in nature and incapable of conveying actual title or creating color of title.
In opposing Smithfield Estates' motion, the Filippis argue that the Hines Deed was not fraudulent, as Mr. Hines executed the deed as an agent for the Town and the *Page 72 
Town's Tax Collector in furtherance of a tax sale absent any fraudulent intent. The Filippis further argue that despite the potential infirmities in the Hines Deed, the instrument vested them with color of title for purposes of constructive possession of the Disputed Lots. Specifically, the Filippis argue that because the Hines Deed transferred both Lake View Park and Chestnut Knoll Tea Lots, and the Filippis' predecessors clearly possessed portions of the Chestnut Knoll Lots with the operation of Ballards, possession of the Filippi Chestnut Knoll Lots is imputable to the Disputed Lots.[57] Additionally, the Filippis cursorily raise the issue of standing. The Filippis contend that Smithfield Estates has no standing to challenge the statutory or constitutional validity of the purported tax sale because neither Smithfield Estates nor its predecessors in interest held a titular interest in the Disputed Lots at the time of conveyance.
 i Standing
While not thoroughly briefed, the Filippis have raised the issue of Smithfield Estates' standing to challenge the Hines Deed as an illegal or unconstitutional tax sale. In so raising the issue, the Filippis cite to the United States Supreme Court case ofLujan v. Defenders of Wildlife for the general proposition that absent an invasion of a legally-protected interest, a claimant suffers no injury-in-fact, as required to maintain standing. 504 U.S. 555, 560 (1992). The Filippis argue that Smithfield Estates and its predecessors had no titular interest in the Disputed Lots at the time the Hines Deed was executed in 1970 and thus were not interested parties requiring notice under the then-existing statutory tax sale scheme. Therefore, the Filippis contend, Smithfield Estates cannot *Page 73 
demonstrate that a legally-protected interest was invaded at the time of the purported tax sale.
The Rhode Island Supreme Court has adopted the view taken by the United States Supreme Court that "[in] an action which will affect an interest in life, liberty, or property protected by the Due Process Clause of the Fourteenth Amendment, a State must provide `notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" HarveyRealty v. Killingly Manor Condominium Ass'n,787 A.2d 465, 468 (R.I. 2001) (citing Robert P. Quinn Trust v.Ruiz, 723 A.2d 1127, 1129 (R.I. 1999) (quoting Mennonite Boardof Missions v. Adams,462 U.S. 791, 795, 103 S. Ct. 2706, 2709,77 L. Ed.2d 180, 185 (1983))). Indeed, property owners and mortgagors possess a legally-protected property interest that may be significantly affected by a tax sale, entitling such parties to notice reasonably calculated to apprise them of a pending tax sale under the due process clause. L. Brayton Foundry Bldg.,Inc. v. Santilli, 676 A.2d 1364, 1366 (R.I. 1996) (citingMennonite, 462 U.S. at 798, 103 S. Ct. at 2711,77 L. Ed.2d at 187). Such notice requirements are set forth in G.L. (1956) §§ 44-9-9 through 44-9-11, which detail the proper procedures for advertisement and notification of a tax sale to taxpayers, mortgagees, and other parties in interest.[58] It is well settled that the failure to comply fully with these statutory-notice provisions invalidates the attempted tax sale.See Arnold Road Realty Assocs., LLC v. Tiogue FireDist., 873 A.2d 119, 130 (R.I. 2005) (citing L. BraytonFoundry Bldg., Inc., 676 A.2d at 1365). *Page 74 
Essentially, the Filippis seek to invoke the general rule that one may not claim standing to vindicate the constitutional rights of a third party. Kowalski v. Tesmer,543 U.S. 125, 136, 125 S. Ct. 564, 572 (2004) (citingBarrows v. Jackson,346 U.S. 249, 73 S. Ct. 1031, 97 L. Ed. 1586 (1953)). Indeed, the tax sale statutes currently address this standing issue within § 44-9-11 (b), amended in 2002 to read[59]
 (b) Only a person or entity failing to receive notice in accordance with the provisions of this section and §§ 44-9-9 and 44-9-10 shall be entitled to raise the issue of lack of notice or defective notice to void the tax sale. The right to notice shall be personal to each party entitled to it and shall not be asserted on behalf of another party in interest. If there is a defect in notice, the tax sale shall be void only as to the party deprived of adequate notice, but shall be valid as to all other parties in interest who received proper notice of the tax sale.
Although subsection (b) was not in effect at the time of the purported tax sale, case law indicates that the Rhode Island Supreme Court adhered to this principle prior to codification of the rule in 2002. See Harvey Realty, 787 A.2d at 467-68.[60]
As discussed, Smithfield Estates submits to this Court numerous deeds that it has acquired concerning the Lake View Park tea lots.See Decision Sec. III. C. Some of these deeds identify specific Disputed Lots, or purport to transfer any and all rights in the entirety of Lake View Park lying to the west of Douglas Pike. Thus, Smithfield Estates may be a successor in interest by deed to lots also made subject of the Hines Deed. As a successor in interest, Smithfield Estates would hold any "rights, privileges, and appurtenances belonging or appertaining to the granted estate[s]."See G.L. (1956) § 34-11-28. *Page 75 See also Rhodes Associates v. City of Woonsocket523 A.2d 878 (R.I. 1987) (Successor in interest of delinquent owner brought suit seeking declaration of invalidity of tax sale). "While it is true that a plaintiff seeking to quiet title must possess sufficient legal interest in the property so as to avoid dismissal for lack of standing, a claim of rightful legal ownership satisfies these requirements." McCartin Leisure Industries,Inc. v. Baker,376 Mass. 62, 66, 378 N.E.2d 980, 983 (1978) (emphasis added). Moreover, it is "well settled" that a grantor, grantee or one whowould take some interest in the real estate as a result of settingaside a deed may attack the deed's validity. SeeNarragansett Indian Tribe v. RIBO, Inc.,686 F. Supp. 48 (D.R.I. 1988) (citing Norris v. Harrison,198 F.2d 953, 954 (D.C. Cir. 1952)); City of Bluefield v.Taylor, 365 S.E.2d 51, 55 (W. Va. 1987)) (emphasis added). "Standing does not require that the party prove their case before the commencement of trial." Pro Indiviso, Inc. v. Mid-MileHolding Trust, 131 Idaho 741, 746, 963 P.2d 1178, 1183 (1998).
This Court notes that more than thirty (30) years have since elapsed from the execution of the Hines Deed to the filing of Smithfield Estates' quiet title action. Generally, a property owner has the right to institute an action, within one year from a decree foreclosing his or her right of redemption, seeking to vacate the decree by demonstrating inadequacy of notice of the tax sale or the foreclosure proceedings. See § 44-9-24; SycamoreProperties, LLC v. Tabriz Realty, LLC,870 A.2d 424, 427-28 (2005). Here, the record reflects that neither the Filippis nor their predecessors ever instituted such foreclosure proceedings. Thus, there is no decree to vacate and the one-year statute of limitations is inapplicable. This case is more analogous to the circumstances presented in Arnold Road Realty Assocs.,LLC, in which a title search conducted in 2000 in *Page 76 
connection with a real estate transaction revealed a potential invalid tax sale of the subject property in 1992. Despite the lapse of time between the tax sale and the filing of the action in 2003, the plaintiffs' ability to challenge the validity of the tax deed was not put into contention. See Arnold RoadRealty Assocs., LLC, 873 A.2d 119; see also RhodesAssociates, 523 A.2d 878 (R.I. 1987) (In this 1985 case, plaintiffs challenged the validity of 1940 tax sale).
Based on the above reasoning, this Court finds that Smithfield Estates has standing to challenge the validity of the Hines Deed, which the Filippis here purport to represent a valid tax sale effectuated by the Town.
 ii Validity of the Hines Deed
Both the right of redemption of the delinquent taxpayer and the rights of the tax sale purchaser are to be determined by the laws in force at the time of the sale. 140 Reservoir AvenueAssociates v. Sepe Investments, LLC,941 A.2d 805 (R.I. 2007) (citations omitted); ABAR Associates v.Luna, 870 A.2d 990, 997 n. 7 (R.I. 2005) (citing Town ofJamestown v. Pennsylvania Company for Banking and Trusts,101 R.I. 274, 279, 221 A.2d 821, 823 (1966)). At the time of the purported tax sale in May of 1970, Rhode Island statutory law required notice and advertisement of the sale of any real estate liable for taxes. Specifically, the version of § 44-9-9 existing at that time provided the following:
 44-9-9. Notice and advertisement of sale. — Before the sale the collector shall give notice of the time and place of sale posted in two (2) or more public places in the town at least three (3) weeks before the time of the sale. The collector shall also cause to be published in some public newspaper published in the town, if there is one, and if there is no public newspaper published in the town, then in some public newspaper *Page 77 
published in the county, a statement concerning the time and place of sale, the real estate liable for payment of taxes, and the name of the person against whom the real estate was assessed, with a list of the parcel or parcels to be offered for sale by the recorded plat and lot number, or by assessors' plat and lot number, or by other adequate description. The newspaper notice giving this full description shall be inserted, once, at least three (3) weeks prior to the date of the advertised sale, and thereafter a weekly formal legal notice, between the date of original advertisement and the time of sale specified in the notice, shall be inserted, stating that the collector will sell at public auction real estate thus advertised. The subsequent formal legal notice shall include reference to the original advertisement which gave full description. Whenever an advertised tax sale is continued or postponed, a formal legal notice giving the new date shall be inserted at least one week prior to the new date.
Pursuant to the versions of §§ 44-9-10 and 44-9-11 then-existing, a tax collector was also required to provide certain individual notice to taxpayers and mortgagees of record.
It is clear from the face of the Hines Deed that no attempt was made by the Town to comply with any of the requisite statutory notice procedures despite any intention to effectuate a tax sale. The Hines Deed is absent any language indicating that the deed was a collector's deed or was in furtherance of a tax sale. Nor does the Hines Deed indicate that sale of the tea lots was advertised or that notice was provided to taxpayers. Indeed, undisputed evidence provided by both parties in connection with these Motions demonstrates that the Town officials desired only to restore these lots to the tax roll without embarking on the arduous and "impractical" task of facilitating a statutory tax sale. Failure to comply fully with statutory-notice provisions invalidates an attempted tax sale. The Hines Deed, as a purported tax sale, is null and void ab initio for failing to effect notice to any proper parties. See Arnold Road Realty Associates,LLC, 873 A.2d 119. Smithfield Estates' motion for summary judgment as to the Filippis' counterclaim based on title by valid deed is granted. The Filippis' cross-motion as to the same is denied. *Page 78 
 iii Color of Title
Despite the invalidity of the Hines Deed, the Filippis maintain that the Hines Deed vested the Filippis' predecessors with color of title sufficient to support the Filippis' claims based on adverse and constructive possession. Specifically, the Filippis contend that any deficiencies in the 1970 Hines Deed were "cured" as early as 1980 based on the Filippis' predecessors' alleged adverse and constructive possession of the Filippi Lake View and Chestnut Knoll Lots.
To hold land under "color of title," a claimant must generally have a written instrument purporting to convey title.Carnevale v. Dupee, 783 A.2d 404, 412 (R.I. 2001) (citing 3 Am. Jur. 2d Adverse Possession § 150). "The object of color of title is not to pass title, but to define the extent of the claim and extend the possession beyond the actual occupancy to the whole property described in the instrument." 3 Am. Jur. 2d AdversePossession § 258 (citing Fore v. Berry,94 S.C. 71, 78 S.E. 706 (1913)). Thus, when a person claiming adverse possession has color of title, as by deed, to a large parcel but has only occupied a portion of the parcel for the statutory period, that claimant has constructively possessed the whole and acquires title to the whole by adverse possession. SeeDaniels v. Blake, 81 R.I. 103, 108 (1953). Color of title, without underlying adverse possession, does not operate to give constructive possession, nor is color of title in and of itself evidence of adverse possession. 3 Am. Jur. 2d AdversePossession § 258 (citations omitted).
Where an assessment for taxes is invalid, and a sale for nonpayment of taxes is made, the purchaser obtaining possession acquires no title until he has been in adverse *Page 79 
possession for the statutory period. Hassett v. Everson,33 R.I. 400, 82 A. 33 (1912); see also Sleboda v.Heirs at Law of Harris, 508 A.2d 652 (R.I. 1986) (tax-sale purchaser and his successors in interest may extinguish the right of redemption by adverse possession if continued for the statutory period of ten years). Such invalid tax deeds have been found to constitute color of title for purposes of adverse possession.Sleboda, 508 A.2d at 656 (quoting 7 Powell Rohan, The Lawof Real Property, ¶ 1013, at 91-39 to 91-40 (1984)). Thus, despite the invalidity of a tax deed, the true owner will be deemed disseised to the extent of the boundaries of such deed by the possession of an adverse claimant of merely a portion of the premises under such deed. 3 Am. Jur. 2d AdversePossession § 258; see also Sleboda, 508 A.2d 652.
In this case, Rhode Island law enables the Filippis to avail themselves of the color of title created by the Hines Deed despite its invalidity and inability to convey actual title. SeeSleboda, 508 A.2d at 656. However, such talk of color of title will be futile if the Filippis fail to establish that the activities on which they rely were of a character to be the basis of title by adverse possession.
This Court notes that the parties dispute whether the Filippis' alleged adverse possession of the Filippi Chestnut Knoll Lots would constitute possession of a portion of the "whole" for purposes of color of title and constructive possession over the Disputed Lots. The Filippis maintain that because lots within both Chestnut Knoll and Lake View Park were subject of the Hines Deed, adverse possession of the Filippi Chestnut Knoll Lots constitutes constructive possession over the remaining Disputed Lots within Lake View Park. On the contrary, Smithfield Estates contends that any adverse possession of *Page 80 
the Filippi Chestnut Knoll Lots alleged by the Filippis is irrelevant because Chestnut Knoll is not adjacent to the westerly portion of Lake View Park.
Indeed, the plat maps submitted by the parties indicate that Chestnut Knoll is separated from the westerly portion of Lake View Park by Douglas Pike. However, the plat maps also indicate that a portion of Lake View Park does lie to the east of Douglas Pike, seemingly adjacent to Chestnut Knoll. The parties have not addressed the effect of this roadway boundary, particularly in light of the fact that the road portions off a small section of Lake View Park that is adjacent to Chestnut Knoll. Moreover, there exists case law specifically addressing the effect of a conveyance of several lots in one instrument for purposes of constructive possession, as well as case law concerning the applicability of constructive possession over parcels distinct from those partially occupied, when the parcels are contiguous and conveyed to the claimant by the same person at one time.[61] In light of the parties' failure to sufficiently brief this issue and the dispute as to the adjacency of Chestnut Knoll relative to Lake View Park, the Court cannot determine this issue as a matter of law at this time.
 2 Adverse Possession by the Filippis
In addition to asserting ownership by virtue of the Hines Deed, discussed supra, the Filippis claim ownership to the Disputed Lots by adverse possession. In their Counterclaim, [62] the Filippis allege that they and their predecessors have been in possession of the Disputed Lots since May 12, 1970 — the date of the Hines Deed. (Defs. Mem. Ex. 2: Counterclaim ¶ 10.) *Page 81 
The Filippis further allege that since 1970, the Filippis and their predecessors have asserted claim of right to the Disputed Lots accompanied by continuous, open, and visible use of said lots in a manner consistent with the use in which an average owner of wooded property would engage. Id. ¶¶ 11-12. The parties do not dispute that the property at issue is undeveloped and wooded.
In moving for summary judgment on the Filippis' Counterclaim, Smithfield Estates contends that despite examining all facts in a light most favorable to the Filippis, the Filippis cannot establish the elements of adverse possession by clear and convincing evidence as a matter of law. Instead, Smithfield Estates posits that the Filippis' possession of the Disputed Lots amounted to no more than casual, irregular and nonexclusive use of the property.
In their cross-motion, the Filippis seek summary judgment on their Counterclaim for adverse possession of the Disputed Lots. The Filippis contend that members of the Filippi family have utilized this wooded land to hike, walk dogs, trap animals, harvest mushrooms, cut trees, collect Indian artifacts and camp from 1970 until the present day. In support of such contentions, the Filippis submit the deposition testimony of Marion Filippi, Paul Filippi, Steven Filippi and Blake Filippi. See
Defs. Mem. Exs. 37-40. The Filippis also claim that they and their predecessors paid all taxes assessed on the Disputed Lots and Filippi Chestnut Knoll Lots from 1970 until 1986, at which point the tax bill for the Disputed Lots was apparently transferred to Mr. Conti.[63] (Defs. Mem. Ex. 18: Tax Bills.) Based on these alleged activities, the Filippis argue that title to the Disputed Lots vested in their predecessors as early as 1980, after ten (10) years of adverse possession. *Page 82 
The historical favoring of land utilization over the disuse of land underlies the origins of adverse possession. SeeCahill v. Morrow, 11 A.3d 82 (R.I. 2011).[64] The doctrine "rests upon social judgment that there should be a restricted duration for the assertion of `aging claims,' and that the passage of a reasonable time period should assure security to a person claiming to be an owner." 16 Powell on RealProperty § 91.01[2] (2011). Obtaining title by adverse possession requires actual, open, notorious, hostile, continuous, and exclusive use of property under a claim of right for at least a period of ten years. Cahill, 11 A.3d at 88 (R.I. 2011) (citingCorrigan v. Nanian, 950 A.2d 1179, 1179 (R.I. 2008) (mem.) and § 34-7-1).[65] The party claiming adverse possession must establish each of these elements by "strict proof, that is, proof by clear and convincing evidence." Tavares v. Beck,814 A.2d 346, 350 (R.I. 2003) (citing Carnevale,783 A.2d at 409 (quoting Anthony v. Searle,681 A.2d 892, 897 (R.I. 1996))). A party asserting title through adverse possession may tack on the period of possession of his or her predecessor in title. Taffinder v. Thomas,119 R.I. 545, 549 381 A.2d 519, 521 (1977). *Page 83 
 i Actual and Continuous Possession
"The elements of `actual' and `continuous' possession are successfully established when the claimant shows that `the use to which the land has been put is similar to that which would ordinarily be made of like land by the owners thereof"Anthony, 681 A.2d at 898 (quoting Lee v. Raymond,456 A.2d 1179, 1183 (R.I. 1983)). A claimant must demonstrate that he or she "has acted toward the land in question `as would an average owner, taking properly into account the geophysical nature of [the] land.'" Id. (quoting Gammons v. Caswell447 A.2d 341, 368 (R.I. 1982)). In cases involving unimproved or remote land, our Supreme Court has held that "if the possession has been maintained in the manner in which owners of like land in similar locations make use thereof, [such use] will suffice."Sherman v. Goloskie, 95 R.I. 457, 466 188 A.2d 79, 84 (1963).
In support of their adverse possession claim, the Filippis cite the case of Sleboda v. Heirs at Law of Harris,508 A.2d 652 (R.I. 1986), in which the Rhode Island Supreme Court upheld a trial court's finding of adverse possession by a tax sale purchaser over "heavily wooded, unimproved land" in Smithfield, Rhode Island. In Sleboda, the plaintiffs and their parents cut trees and gathered firewood on the inaccessible "wild and overgrown" property two or three times each year between the 1950 tax sale and 1976.[66] The trial justice determined that given the character of the property, "the plaintiffs possessed and enjoyed it in the only way that it could be possessed and enjoyed and in a manner that was consistent with the possession and enjoyment of surrounding properties." Id. at 657-58. In light of undisputed evidence that such activities took place *Page 84 
every year from 1950 to 1976 and that during that period there was no indication that the property was being used by anyone other than plaintiffs or their predecessors, the trial justice found, and the Rhode Island Supreme Court affirmed, that "considering the nature of the property and the use to which it could reasonably be put, that plaintiffs' possession and enjoyment was sufficiently exclusive and uninterrupted as to satisfy the requirements of § 34-16-7."Id. at 658.[67]
Notwithstanding the Filippis' argument of constructive possession premised on their possession of the Filippi Chestnut Knoll Lots, the Filippis assert that their possession over the Disputed Lots far exceeds the actual and continuous activities described inSleboda. In support of this contention, the Filippis point to the payment of taxes, as well as the hiking, trapping, mushroom harvesting, tree cutting, artifact collecting and camping upon said lots. The Filippis contend that these acts are analogous to the actions in which a true owner would partake upon heavily wooded land. The Filippis further argue that development of the Disputed Lots would have been impracticable, given the checkerboard-like disbursement of the lots throughout Lake View Park and the unbuildable nature of each individual lot. Additionally, the Filippis maintain that the multiple familial transfers of ownership interests in the Disputed Lots since 1970, as well as the Filippis' predecessors' affirmative defense of their title in past tea lot litigation, also demonstrate their actual and continuous possession of the property since 1970. *Page 85 
Smithfield Estates contends otherwise, arguing that the evidence submitted by the Filippis fails to demonstrate any actual and continuous possession of the Disputed Lots for the minimum statutory period of ten (10) years. Citing Sherman, Smithfield Estates argues that even where the land in dispute is wild or unimproved, the claimant still has the burden of proof to sufficiently prove acts of dominion manifesting an intent to oust the true owner and to put the true owner on notice of the claim of ownership. 95 R.I. at 465-66, 188 A.2d at 83-84. Smithfield Estates avers that the Filippis have failed to establish such acts of dominion and maintains the acts alleged by the Filippis fall short of an exercise of ownership sufficient to manifest an intent to oust the true owner. (Pls. Mem. p. 10.) Smithfield Estates further contends that Lake View Park, while wooded and unimproved, is adjacent and accessible to a main road and other properties developed with homes and businesses.
The question of whether the elements of adverse possession are sufficiently shown is essentially a question of fact. "This is because `[t]he nature and the extent of occupancy required to establish a right by adverse possession vary with the character of the land, the purposes for which it is adapted, and the uses to which it has been put.'" See Kershaw v. Zecchini,342 Mass. 318, 320, 173 N.E.2d 624, 626-27 (1961) (quotingLaChance v. First Nat. Bank Trust Co.,301 Mass. 488, 490, 17 N.E.2d 685, 686 (1938)); see alsoStriefel v. Charles-Keyt-Leaman P'ship,733 A.2d 984, 989 (1999) ("Adverse possession presents a mixed question of law and fact . . . what acts of dominion will result in creating title by adverse possession is a question of law . . . whether those acts were really done, and the circumstances under which they were done, raise questions of fact") and PalisadesSales Corp. v. Walsh, 459 A.2d 933, 936 (R.I. 1983) (factual *Page 86 
determinations are generally necessary to determine whether claimants have established the elements of a prescriptive easement). Important to a Court's analysis is the credibility and weight to be given to the testimony of witnesses to acts of dominion "as it relates to the opportunity they had to acquire knowledge as to that to which they testified." Sherman,95 R.I. 465, 188 A.2d 83 ("the trial justice, confronted with a mass of conflicting evidence on the issue of adverse possession, was duty bound to determine therefrom, on the basis of credibility and weight, whether appellant did exercise a dominion over the land in question that was sufficient in law to constitute adverse possession"). Based on the fact intensive nature of such claims, the Rhode Island Supreme Court has cautioned against the determination of adverse possession claims on summary judgment as a matter of law.See M B Realty, Inc. v. Duval,767 A.2d 60, 64 (R.I. 2001) ("in the case at bar, we are satisfied that the facts are distinguishable from Kotuby andRobidoux such that the question of adverse possession is not subject to a ruling as a matter of law. The decisions inKotuby and Robidoux were fact intensive determinations made after a trial on the merits"); see also Stone v. GreenHill Civic Ass'n, Inc., 786 A.2d 387 (R.I. 2001) ("motion justice prematurely entered judgment. . . . Given the conflicting evidence on permissive use, he could not do so without the benefit of making factual findings and credibility determinations about the nature of the beach use and how it may have changed or evolved over time.")
As disclosed by the record before the Court, the facts underlying both the Filippis' and Smithfield Estates' competing claims based on adverse possession are extensive and complex in nature. While some facts may be undisputed by the parties, numerous facts have not been adequately developed in the summary judgment record, and certain other *Page 87 
facts are clearly in dispute. For instance, in regard to the Filippis' alleged actual and continuous possession of the Disputed Lots, there are issues of facts that need to be resolved concerning the specific acts in which the Filippis partook; particularly, the timing of such alleged acts of dominion. In Marion Filippi's deposition, she testified that she and her husband began walking Lake View Park in 1973 "about once a month" from October through May. (Defs. Ex. 37: Dep. of Marion Filippi pp. 31-33.) From 1975 to 1981, she noted that it was primarily her husband, Paul Filippi, Sr., that walked the tea lots with their children.Id. p. 34. Thus, the period of 1970 to 1973 appears to be unaddressed.
Marion Filippi also testified that as teenagers, the Filippi children camped "a couple times a year" on the subject property during the 1980s and 1990s. Id. at 34-35. While the three Filippi sons testified as to such camping activities, the testimony provided by Paul, Steven and Blake does not align as to the timing of these acts. Blake, born in 1980, testified that he recalled camping with family members in Lake View Park at various ages — 8, 9, 12, 13, and 14 years old. (Defs. Mem. Ex. 38: Dep. of Blake Filippi pp. 27-28.) Thus, Blake's recollections place his camping activities between approximately 1988 and 1994. Steven, born in 1979, recalled utilizing the subject property his "whole life" and camping in the age range of 12 to 18 years old, placing his camping acts somewhere between 1991 and 1997. (Defs. Mem. Ex. 40: Dep of Steven Filippi pp. 14, 17.) Paul, on the other hand, testified that he recalled camping from a "young" age, "probably about five or six" until the age of 10. (Defs. Mem. Ex. 39: Dep. of Paul Filippi pp. 31-32.) Having been born in 1975, Paul would have camped in Lake View Park between 1980 and 1985. While the discrepancies in dates may certainly be *Page 88 
explicable given age differences, attendance at certain camping trips, or other reasons, the testimony regarding the Filippis' camping activities illustrates just one of many factual issues that remain to be resolved at trial, particularly in light of the Filippis' repeated assertion that title by adverse possession vested "as early as 1980."
Aside from issues of fact created by the deposition testimony elicited in this case regarding the timing of the Filippis' use of the subject real estate, the character of the property at issue is also disputed. Smithfield Estates contends that Lake View Park, although wooded and unimproved, was not truly wild and remote given its adjacency to both a main road and other properties with established businesses and residences.[68] On the contrary, the Filippis maintain that the Disputed Lots existed and remained as heavily wooded land, akin to the property at issue inSleboda. Marion Filippi described the land as "overgrown," "leaf covered," "vacant," and "earthen and rocky" with trees, flowering shrubs and boulders. (Defs. Mem. Ex. 37: Dep. of Marion Filippis pp. 33-34.) Blake characterized the land as wooded with animal trails (Defs. Mem. Ex. 38: Dep. of Blake Filippi p. 23), Paul described it as "heavily wooded" (Defs. Mem. Ex. 39: Dep. of Paul Filippi p. 33) and Steven recalled the land as having trees and rocks. (Defs. Mem. Ex. 40: Dep. of Steven Filippi p. 15.) Furthermore, the Filippis testified that their alleged acts of hiking, mushrooming, trapping, camping, tree cutting, and walking upon the land in question were generally not visible to passersby given the wooded nature of the property. (Defs. Mem. Ex. 37: Dep. of Marion Filippi p. 38-39; Ex. 38: Dep. of Blake Filippi p. 31.) *Page 89 
After a thorough review of the record in conjunction with the argument presented at hearing, this Court finds that genuine issues of material fact exist as to the actual and continuous nature of the Filippis' (and their predecessors') alleged possession of the Disputed Lots. Given the apparent dispute as to such material facts, this Court cannot determine whether the Filippis or their predecessors have acted toward the land in question as would an average owner, taking into account the character of the land.See Anthony, 681 A.2d at 898; see alsoSleboda, 508 A.2d at 658. Nor can this Court establish whether the Filippis' alleged acts of dominion manifested an intent to "oust the true owner" as required by Rhode Island law, absent factual findings as to what acts took place and at what time. SeeSherman, 95 R.I. at 465-66, 188 A.2d at 83-84.
 ii Open and Notorious
Although unnecessary given the issues of material fact in dispute, this Court will briefly examine the remaining elements of the Filippis' counterclaim for adverse possession. In addition to actual and continuous possession, a claimant must also prove by clear and convincing evidence open and notorious possession for a ten (10) year period in order to sustain a claim of adverse possession. In other words, "claimants must show that their use of the land was sufficiently open and notorious to put a reasonable property owner on notice of their hostile claim." Tavares,814 A.2d at 352. No particular act on the part of the claimant is required to put the world on notice. Id. "It is sufficient for the claimant to go upon the disputed land and use it adversely to the true owner. The owner then becomes chargeable with knowledge of whatever occurs on the land in an open manner." Id. (quotingLee v. Raymond, 456 A.2d 1179, 1183 (R.I. 1983)). *Page 90 
The Filippis allege that their camping activities, tree cutting and animal trapping left visible signs of their use of the tea lots. The Filippis also maintain that tax payments from 1970 to 1986 by their predecessors, as well as their predecessors' participation in past tea lot litigation further demonstrates their open and notorious use of the subject property. Conversely, Smithfield Estates avers that the Filippis did not utilize the Disputed Lots openly and notoriously to put a reasonable property owner on notice of their claim of ownership because the acts in which the Filippis and their predecessors partook were not visible to others. However, Smithfield Estates' argument is misplaced. The Rhode Island Supreme Court has held that
 "even though the visibility of the adverse uses from any street or lot line may be considered in determining whether the uses in question were sufficiently open and notorious to put the owner of record on constructive notice of same, it is not essential for an adverse claimant to show that the uses in question were observable from the nearest improved road or lot line to establish these elements of adverse possession. Rather, the proper inquiry is whether [the claimant] used the property in a manner consistent with how other owners of rural, undeveloped woodlands typically would use such land, and whether these uses took place in a manner `calculated to attract attention,' thus placing the world on constructive notice of his [or her] adverse claim." Tavares, 814 A.2d at 354 (citing Sherman, 95 R.I. at 466, 188 A.2d at 84 (quoting Marvel v. Barley Mill Road Homes, Inc., 104 A.2d 908, 911 (Del.Ch. 1954))) (emphasis added).
As discussed, questions as to the character of the subject tea lots and the manner in which the Filippis allege to have used those lots remain in dispute. Such factual issues must be resolved before a court can decide whether the Filippis used the property in a manner consistent with how other owners of similar land typically would use such land, and whether these uses took place in a manner calculated to attract attention. See id. Moreover, issues of fact remain as to whether such use was visible to others, particularly in light of deposition testimony that indicates that both Paul Filippi, Sr. and Paul Filippi *Page 91 
spoke to Mrs. Belcher within Lake View Park on multiple occasions. Thus, whether the Filippis did or did not openly and notoriously utilize the land to sufficiently place the world on notice is not presently determinable as a matter of law.
 iii Hostile and Under Claim of Right
As recently noted by the Rhode Island Supreme Court inCahill, "requiring] adverse possession under a claim of right is the same as requiring hostility, in that both terms simply indicate that the claimant is holding the property with an intent that is adverse to the interests of the true owner."11 A.3d at 89 (citing Tavares, 814 A.2d at 351 (quoting 16 Powell on RealProperty, § 91.05[1] at 91-28 (2000))). "[A] claim of right may be proven through evidence of open, visible acts or declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the record owner."Tavares, 814 A.2d at 351 (citing 16 Powell on RealProperty § 91.05[4] at 91-28, 91-29 and citing as examplePicerne v. Sylvestre,122 R.I. 85, 91-92, 404 A.2d 476, 479-80 (1979)). "Hostility of possession necessary to establish adverse possession implies the denial of the owner's title; and possession, however open and long it may be, is not adverse without the denial of the owner's title."Cahill 11 A.3d at 89 (quoting Picerne,122 R.I. at 92, 404 A.2d at 480). Even if a claimant possesses knowledge that he or she lacks colorable title, the pertinent inquiry centers on a claimant's objective manifestations of adverse use rather than on the claimant's knowledge. Tavares, 815 A.2d at 351. However, "an acknowledgment of the owner's title terminates the running of the statutory period, and any subsequent adverse use starts *Page 92 
the clock anew." Cahill, 11 A.3d at 93 (quoting Bowen v.Serksnas, 121 Conn. App. 503, 512, 997 A.2d 573, 579 (2010)).
Here, Smithfield Estates contends that the Filippis cannot establish the elements of hostility and claim of right as a matter of law, thus precluding any claim to the Disputed Lots based on adverse possession. Citing Anthony, Smithfield Estates maintains that the Filippis cannot make a showing that their alleged possession was "to a visible line in all events."681 A.2d at 898 (quoting LaFreniere v. Sprague,108 R.I. 43, 50, 271 A.2d 819, 822 (1970)) ("A claimant makes a showing that the possession was `hostile' if a determination is made `that the possession of the occupier is to a visible line in all events, regardless of the location of the true boundary line'"). Specifically, Smithfield Estates argues that the Filippis' and their predecessors' alleged acts of dominion were not witnessed by anyone other than Filippi family members and on occasion Mrs. Belcher, and were often restricted to merely the trails within Lake View Park. Smithfield Estates contends the Filippis' acts were hardly visible, not objectively observable, sporadic, limited, and temporary.
On the contrary, the Filippis aver that based on the evidentiary record, this Court can conclude the Filippis' and their predecessors' possession of the Disputed Lots was hostile and under claim of right for a period of ten (10) years. In particular, the Filippis point to the Hines Deed, the payment of taxes, and the alleged long-term use of the subject property as unequivocal indications of the Filippis' claimed ownership of the land adverse to any other owner.
In presenting its hostility argument, Smithfield Estates cites to the "visible line" language utilized in Anthony andLaFreniere. In LaFreniere, the Rhode Island Supreme *Page 93 
Court sustained the soundness of the rule that "where a person through mistake as to the boundary line takes possession of land belonging to another, believing it to be his own, the holding is adverse, and if continued for the requisite period, will give title by adverse possession." 108 R.I. at 50, 271 A.2d at 823 (quotingDodge v. Lavin, 34 R.I. 514, 518, 84 A. 857, 858 (1912)). Thus, "if it is determined that the possession of the occupier is to a visible line in all events, regardless of the location of the true boundary line, his possession is hostile and adverse possession can be established therefrom." Id. at 49, 271 A.2d at 822. This rule was affirmed to prevent a finding of "no hostility" in cases where "the evidence reveals that the possessor holds land beyond his true boundary but with the intention of claiming to the true boundary." Id. Here, the Court is not faced with a case of mistaken boundaries. Thus, this portion of the Anthony case relied upon by Smithfield Estates is not dispositive of the hostility analysis at hand.
Instead, the more pertinent inquiry as to the Filippis' alleged hostile possession under claim of right centers on the Filippis' objective acts of ownership evidencing an intent to use and possess the premises in a manner adverse to a true owner. Tavares,814 A.2d at 351-52. Here, the character of the land, as well as the timing and nature of the acts in which the Filippis and their predecessors partook, is essential to determining the Filippis' and their predecessors' intent in using and possessing the tea lots at issue. Therefore, whether the Filippis and their predecessors did or did not possess the Disputed Lots in a hostile manner cannot be determined as a matter of law absent factual findings at trial. *Page 94 
 iv Exclusive
A claimant who attempts to establish adverse possession in Rhode Island must establish that he or she exclusively used the property for the statutory period of ten (10) years. Exclusivity requires that the claimant "hold the possession of the land under a claim of ownership and not on behalf of another." 3 Am Jur. 2d AdversePossession § 67. Here, the Filippis maintain that there exists no evidence to controvert their exclusive use of the land at issue, whether or not res judicata bars evidence of any alleged acts upon the land by the Belchers and/or Mr. Conti. Smithfield Estates contends, however, that the Filippis fail to satisfy the exclusivity element because the Filippis or their predecessors never excluded the Belchers from their homestead or from using the surrounding land.
As determined in this Decision, evidence of any possessory acts by the Belchers or Sarah Hayes prior to the Belcher I Action is not barred by the doctrine of res judicata.[69] See
Decision Sec. III.A.1.ii. While it is undisputed that the Filippis or their predecessors did not exclude the Belchers from their homestead or from Lake View Park, there does exist issues of fact as to how the Belchers may have used the land and whether such use was pursuant to the Filippis' permission after the 1970 tax sale.See Defs. Mem. Ex. 39: Dep. of Paul Filippi pp. 25-27.[70]
Moreover, "to find that [a] property was not used exclusively by the adverse possession claimant, there [must] be evidence indicating *Page 95 
that the [challenging party] or others had made improvements to the land or, at the very least, had used the land in a more significant fashion than merely walking across it." Gammons, 447 A.2d at 368. Smithfield Estates has submitted evidence in stark contrast to the Filippis' assertion that they exclusively possessed the Disputed Lots. Of significance is the Affidavit of Sarah Hayes, in which she attests to her and her family's use of "all of the Tea Lots on Lake View Park Plat" for fifty (50) years, beginning in 1951. (Aff. of Sarah Hayes ¶ 9.) In her Affidavit, Sarah Hayes stated that her family utilized all of the property as if it were their own by participating in hunting, shooting, archery, logging, maintaining livestock and pets, planting, cutting trees, harvesting berries, playing, posting signs, installing a well, among other alleged acts. Id. at ¶¶ 9-17. In light of this conflicting evidence regarding the Filippis' alleged exclusive use of the Disputed Lots, factual issues remain unresolved. Thus, whether or not the Filippis possessed the Disputed Lots exclusively for a period of ten (10) years cannot presently be determined as a matter of law.
Both Smithfield Estates and the Filippis have moved for summary judgment on the Filippis' counterclaim. Cross-motions require the Court to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. Curran,509 F.3d at 44. Given the dispute of material facts essential to proving the Filippis' claim of adverse possession, this Court cannot conclude that either party is entitled to judgment on the counterclaim as a matter of law. Both parties' motions on the Filippis' counterclaim relative to adverse or constructive possession are denied. *Page 96 
 E Adverse or Constructive Possession by SmithfieldEstates
The Filippis' final motion for partial summary judgment concerns Smithfield Estates' claim to the Disputed Lots based on the adverse or constructive possession of its predecessors in interest. The Filippis maintain that no genuine issues of material fact exist, and that Smithfield Estates cannot establish the requisite elements of adverse or constructive possession as a matter of law. As discussed, any claim by Smithfield Estates based on the acts of the Belchers is not barred by res judicata; however, any claim based on the acts of Mr. Conti prior to 1987 is so barred.
Smithfield Estates contends that aside from the Downes Land and the Belcher Tea Lots, the Belchers acquired title to the remaining Lake View Park tea lots and "paper streets" by virtue of their adverse possession for the statutory period. In support of this contention, Smithfield Estates submits to this Court the Deposition and Affidavit of Sarah Hayes, in which she details the Belchers' use of the Lake View Park tea lots on the westerly side of Douglas Pike. Sarah Hayes claims that she and her family openly occupied and used the real estate continuously from 1951 until September of 2002.[71] (Aff. of Sarah Hayes ¶ 9.) Sarah Hayes testified that her father, Walter Belcher, used the entire wooded area within the westerly portion of Lake View Park for hunting, shooting, archery and logging. Id. at ¶¶ 10-11. Edith Belcher utilized the woods to keep livestock and pets that were allowed to freely roam the entirety of Lake View Park, as well as water at a spring located within the plat. Id.; see also
Defs. Mem. Ex. 43: Dep. of Sarah Hayes p. 27-29. In addition to planting trees in the 1950s, Sarah Hayes recalled the *Page 97 
cutting of approximately twenty (20) trees in the 1970s to prevent gypsy moth infestation. Id. at ¶ 12. The family harvested berries within the subject property when available. Id. Sarah Hayes testified that she, as a child, and later her own children played in the woods. Id. at ¶ 13.
In the area surrounding the homestead, the Belchers cut the grass, planted a garden, maintained animals shelters, installed an artisan well in 1957, paved a 380-foot driveway in 1969, built a shed serviced by electricity, and installed a septic system in the 1980s.Id. at ¶¶ 15-16. Sarah Hayes recalled her father posting the property with "no trespassing" signs, and ordering individuals who came upon the land and claimed to have an interest in the property to leave the premises and "go see a lawyer."Id. at ¶ 14. On one occasion, Sarah Hayes remembers calling the Smithfield Police to remove trespassing individuals. Sarah Hayes also testified to have blocked paths within the wooded portion of Lake View Park to prevent the use of recreational vehicles and dirt bikes. Id. Sarah Hayes alleged she and her parents paid all tax bills relative to the Belcher Tea Lots obtained in 1953.Id. at ¶ 12. Sarah Hayes also claims to have operated a state-licensed daycare business at the homestead from 1979 to 1983.Id. at ¶ 17.
Based on this evidence, Smithfield Estates contends that the Belchers and Sarah Hayes actually, openly, notoriously, exclusively, under claim of right and continuously occupied all of the Lake View Park tea lots on the westerly side of Douglas Pike from 1951 until 2002. Smithfield Estates avers that no other person occupied any portion, aside from the Belchers' tenants, during this entire fifty (50) year period. Conversely, the Filippis maintain that even viewing this evidence in the light most favorable to Smithfield Estates, the elements of adverse possession cannot be met as a matter of law. *Page 98 
Without embarking on a detailed adverse possession analysis, it is clear that the consideration of evidence concerning the Belchers' alleged possessory acts viewed in conjunction with the evidence submitted as to the Filippis' alleged acts upon the same land renders the determination of Smithfield Estates' adverse possession claim as a matter of law unviable absent the finding of facts material to assessing whether the Belchers' use satisfied each element of adverse possession. As discussed, there exist issues of fact as to the character of the land at issue — a fact material to determining whether the Belchers' use was actual, hostile, open and notorious. See Anthony, 681 A.2d at 898; seealso Sleboda, 508 A.2d at 658. Moreover, there are clearly issues of fact as to the Belchers' alleged exclusive possession under claim of right given the alleged interactions and discussions between Edith Belcher and members of the Filippi family concerning the property.[72] Yet another dispute of fact is evident when comparing Sarah Hayes' deposition testimony to her Affidavit relative to her understanding of Lake View Park's boundaries and the Belchers' occupation thereon. In her Affidavit, Sarah Hayes attests to her family's occupation of the entirety of the westerly portion of Lake View Park; however, her deposition testimony reveals that at the time she lived on the subject property, she "did not know the real boundaries" and had been unaware of Mr. Surabian's encroachment upon Lake View Park until 1997. In fact, Sarah Hayes stated that "all [she] cared about was the woods [she] was in, [and her] driveway" when questioned as to Mr. Surabian's encroachment, and further stated that she "imagine[d] the tea lots take up eighty percent of the area that I lived in with the driveway." (Defs. Mem. Ex. 43: Dep. of Sarah Hayes pp. 70-73.) Clearly, such credibility concerns and disputes of material fact *Page 99 
as to the Belchers' alleged adverse possession are reserved to the factfinder. See Sherman,95 R.I. 465, 188 A.2d 83; Stone., 786 A.2d 387 (R.I. 2001). The Filippis' motion for partial summary judgment as to Smithfield Estates' claim of adverse possession based on acts of the Belchers and Sarah Hayes is denied.
The evidence regarding any possessory acts on the part of Mr. Conti is far more limited given the preclusive effect ofres judicata, discussed supra. Consequently, Smithfield Estates cannot rely on evidence of Mr. Conti's alleged possessory acts within Lake View Park prior to 1987. Essentially, the only evidence of record submitted in connection with these motions regarding Mr. Conti's use of Lake View Park subsequent to 1987 is Mr. Conti's tax records. Aside from these tax rolls and documents, the record is devoid of evidence suggesting acts of actual, open, notorious, hostile, and exclusive use under claim of right by Mr. Conti for a ten (10) year period after 1987. Nor does Smithfield Estates address the Filippis' challenge to a claim based on Mr. Conti's possessory acts in their memoranda submitted in opposition to the Filippis' multiple motions.[73] Thus, this Court finds that Smithfield Estates has failed to meet its burden in demonstrating by competent evidence that a genuine issue of material fact exists as to any alleged adverse possession on the part of Mr. Conti. Accordingly, the Filippis' motion for partial summary judgment as to Smithfield Estates' claim of adverse possession based on the acts of Mr. Conti is granted. *Page 100 
 IV Conclusion
Based on the above reasoning, this Court renders the following decisions:
(1) Smithfield Estates' motion for summary judgment on the Filippis' Counterclaim is granted as to the invalidity of the Hines Deed and denied as to claims of adverse or constructive possession.
(2) The Filippis' cross-motion for summary judgment on their counterclaim is denied.
(3) The Filippis' motion for partial summary judgment as to the application of res judicata is:
 (a) Denied as to Smithfield Estates' claims premised on acts of the Belchers and Sarah Hayes;
 (b) Granted as to Smithfield Estates' claims premised on the Conti Deed and acts of Mr. Conti prior to the filing of the Conti Action in 1987.
(4) The Filippis' motion for partial summary judgment as to judicial estoppel is denied.
(5) The Filippis' motion for partial summary judgment as to Smithfield Estates' claims based on marketable record title is denied.
(6) The Filippis' motion for partial summary judgment as to Smithfield Estates' claims based on adverse or constructive possession is denied.
Counsel shall submit an appropriate order for entry.
[3] A small portion of the plat was located to the east of Douglas Pike. (Pl. Mem. Ex. 1: Plan of Lake View Park.)
[4] The plat of Lakeview Park is recorded in the Town of Smithfield Land Evidence Records on Plat Card 28 and is entitled
 Plan of LAKEVIEW PARK Situated in Smithfield R.I. owned by John M. Hathaway Scale 1 inch = 50 ft. Frank M. Metcalf C. E. New Bedford Mass. January 1902 Reduced by R .S. Mowry C .E. April 1913 Scale 80 ft = 1 inch Noted the sizes of the Regular Lots Average 25 X 60 ft. The Streets upon the Plat except Smithfield Road and Douglas Ave. are 30 ft. wide. (Second Am. Compl. ¶ 4; Pl. Mem. Ex. 1: Plan of Lake View Park.)
[5] One newspaper article has surmised that it would take more than fifty (50) tea lots to create a legal, buildable lot under Smithfield ordinance provisions. (Defs. Mem. Ex. 25: ProvidenceSunday Journal Article dated July 24, 1988.)
[6] John M. Hathaway conveyed almost all of the tea lots within Lake View Park. However, the parties dispute the actual number of lots not conveyed. Smithfield Estates alleges that forty-one (41) tea lots were not conveyed (Second Am. Compl. ¶ 9), while the Filippis aver that only nine (9) tea lots remained unsold, pointing to a title report filed in a prior matter. (Defs. Mem. p. 3 n. 3).
[7] It was later determined that the homestead was situated on a proposed road within the bounds of Lake View Park. (Pl. Suppl. Ex. 22: Dep. of Sarah Hayes at pp. 12-13.)
[8] The record indicates that Sarah Hayes is also known as Sarah Belcher, Sarah Belcher-Hayes, and Sarah Sangiovanni. For purposes of this Decision, the Court shall refer to the Belchers' daughter as "Sarah Hayes."
[9] The record reflects that Sarah Hayes granted a mortgage concerning the Downes Land in 1980, excepting the parcel deeded to Louis Giuliano. This mortgage has been since discharged. (Aff. of Sarah Hayes Ex. 8.) Sarah Hayes also secured a mortgage on certain Lake View Park tea lots in 1997. This mortgage was also discharged. Id at Ex. 9.
[10] The Deposition of Edith Belcher submitted in connection with the instant motions for summary judgment was taken on December 5, 1988 concerning a prior quiet title action involving the tea lots, captioned Crescenzo Conti v. John H. Hines etal., C.A. No. PC-87-5072.
[11] The Deposition of Paul Filippi, Sr. submitted in conjunction with the instant motions for summary judgment was taken on June 13, 1988 with regard to Crescenzo Conti v. John H. Hineset al., C.A. No. PC-87-5072.
[12] The Disputed Lots are separate and distinct from the Belcher Tea Lots conveyed to the Belchers from the Town in 1953, with the exception of two tea lots (454 and 502) that appear on both the Belchers' 1953 tax deed and the Hines Deed. See
Pl. Mem. Ex. 4: Hines Deed; Pl. Mem. Suppl. Ex. 15: Tax Deed.
[13] The Hines Deed was also signed by Mr. Hines' wife, Rosalie Lopez Hines, as a grantor. (Pl. Mem. Ex. 4: Hines Deed.)
[14] The mortgage was eventually discharged on March 10, 2006. (Pl. Mem. Ex. 54: Discharge of Mortgage.)
[15] Notably, Leonard W. Hathaway and Alexis Proctor claimed to be heirs of two different individuals named John M. Hathaway, both of New Bedford. The record reflects that neither of these individuals has been confirmed as the John M. Hathaway that conveyed the platted tea lots. See Defs. Mem. Ex. 7: Preliminary Title Analysis dated May 9, 1989 completed by Real Estate Title Insurance Company in connection with Crescenzo Conti v. John H. Hines et al., C.A. No. PC-87-5072; see also Defs. Mem. Ex. 26: Smithfield Estates Title Report Devisee Summary.
[16] The deed from B. I. Realty to Mr. Notorantonio identifies twenty-three (23) lots within Chestnut Knoll as the subject of the conveyance; however, the Notorantonio quiet title action involved only five of these lots. See Defs. Mem. Ex. 16: Notorantonio Deed; see also Defs. Mem. Ex. 17: Notorantonio Action Complaint.
[17] Paul Filippi, Sr. passed away in 1992, vesting any interest he held in the tea lots in Marion Filippi by operation of law.
[18] The Superior Court also entered a separate Consent Judgment quieting title with respect to any claims made by Mr. D'Ambra, his wife, East Coast, Maine Development, Inc., and Domestic Safe Deposit Company. (Pl. Suppl. Ex. 21: Consent Judgment entered May 4, 1988.) For purposes of this Decision, this Court will refer to the 1989 Judgment as the Belcher I Action Judgment. Any reference to the 1988 Consent Judgment will be so indicated.
[19] The reason behind this apparent incongruity is disputed by the parties in this case. The Filippis maintain that the Belcher I Action "was deceitful and potentially committed a fraud upon [the] Court" by listing the nearly sixty (60) Extra Lots not originally identified in the 1953 Tax Deed. (Defs. Opp. pp. 12-13.) On the contrary, Smithfield Estates contends that a review of the pertinent pleadings and deeds evinces an apparent scrivener's error by Edith Belcher and Sarah Hayes when composing their pro se complaint, and that the inclusion of the Extra Lots was not intentional. (Pl. Reply Mem. p. 40 n. 4.) Additionally, the record reflects that while the property description utilized in the Belcher I Action Complaint included the Extra Lots, the Abstract and Report of Title Examiners submitted in connection with the Belcher I Action did not consider the Extra Lots. (Defs. Mem. Ex. 28: Belcher I Action Title Abstract.)
[20] The remaining lots comprising the Extra Lots are "miscellaneous" Lake View Park tea lots, neither falling under the classification of Belcher Tea Lots nor Disputed Lots.
[21] Also in 1987, Mr. Conti began paying taxes on several lots, including lots claimed by the Filippis. The Town's tax records indicate these taxes were previously paid by B. I. Realty from 1970-1986. (Defs. Mem. Ex. 18: Excerpts from the Town's Tax Rolls.)
[22] Defendants' Exhibit 29 consists of multiple pleadings, orders, and other documents relative to the Conti Action. The particular document within Exhibit 29 to which the Court is referencing will be identified.
[23] In her counterclaim, Edith Belcher also sought damages based on slander of title, as well as injunctive relief relative to the alleged illegal cutting of trees by Mr. Conti.
[24] Section 34-16-2 requires that
 Upon filing his or her complaint, the plaintiff shall thereafter, at his or her own cost, select, with the approval of the court, a title company or an attorney familiar with the examination of land titles, which company or attorney shall proceed to examine the title to the real estate described in the complaint, and when the examination is completed, shall deposit an abstract of title to the real estate in the court, together with a report of the status of the title and a list of the parties found interested therein, and who should, in the opinion of the company or attorney, be made parties to the action. Upon receipt of the abstract and report, the court shall order all persons not parties to the action but found by it to be necessary to the cause to be made parties defendant and shall order notice to be given to those defendants.
[25] Defendants' Exhibit 30 consists of multiple pleadings, orders, and other documents relative to the Surabian Action. The particular document within Exhibit 30 to which the Court is referencing will be so identified.
[26] The record also discloses that prior to the entry of judgment in the Surabian Action, Edith Belcher, Sarah Hayes, and the Filippis' predecessors settled with Mr. Surabian. Edith Belcher and Sarah Hayes conveyed a portion of Lake View Park to Mr. Surabian in April of 2001. (Defs. Mem. Ex. 14: Quit-Claim Deed dated April 25, 2001 and recorded June 11, 2001.) The Filippis maintain that this deed purportedly conveyed both Belcher Tea Lots and Disputed Lots occupied by Mr. Surabian. (Defs. Mem. p. 18.) The Filippis assert that they conveyed only lots to which they claimed title under the Hines Deed. Id.
[27] With the exception of land previously granted to Mr. Giuliano and Mr. Surabian.
[28] Smithfield Estates filed an Amended Complaint on July 22, 2005 and a Second Amended Complaint on December 13, 2005.
[29] The Filippis' counterclaim does not concern the approximately one hundred (100) "miscellaneous" Lake View Park tea lots that were not identified in either the Hines Deed or the Belchers' 1953 Tax Deed.
[30] While claim preclusion prohibits the "relitigation of all the issues that were tried or might have been tried in the original suit," the doctrine of collateral estoppel or issue preclusion, by contrast, "makes conclusive in a later action on a different claim the determination of issues that were actually litigated in a prior action." See Lennon v. Dacomed Corp.,901 A.2d 582, 590 (R.I. 2006) (quoting E.W. Audet Sons,Inc. v. Fireman's Fund Insurance Co. of Newark, New Jersey,635 A.2d 1181, 1186 (R.I. 1994)).
[31] The parties do not dispute that a final judgment on the merits entered in the Belcher I Action.
[32] Section 34-16-12 mandates that
 [s]ervice of process upon all unknown defendants, resident or nonresident, or others known, but whose names or addresses are unknown to, or unascertained by, the plaintiff shall be made by publication of an order of notice, to be entered by the court in some public newspaper published in this state, to be designated by the court, for such length of time as the court shall direct.
[33] A scrivener's error is synonymous with a clerical error, which is an error "resulting from a minor mistake or inadvertence, especially] in writing or copying something on the record, and not from judicial reasoning or determination." Black's LawDictionary (9th ed. 2009); see U.S. v. Gibson,356 F.3d 761, 766 n. 3 (7th Cir. 2004).
[34] A comparison of the 1953 Tax Deed and the Belcher I Action Complaint reveals that Edith Belcher and Sarah Hayes listed Lots 172-266 instead of 172-177, 186, 187, 201, 218-221, 228, 231-240, 245-249, 254 and 255. In addition, the Belcher I Action Complaint identifies Lot 565, whereas the 1953 Tax Deed lists Lot 562.
[35] For instance, the third line of lot numbers listed on the 1953 Tax Deed appears to have been skipped over during transcription.
[36] This Court also notes that Sarah Hayes and Edith Belcher included the Extra Lots in the list of tea lots they claimed to already own in fee simple under Count I of the Belcher II Action Complaint filed in 2002. (Defs. Ex. 49: Belcher II Action Compl.) However, the Belcher II Action did not advance to a stage at which the trial court would be required to interpret the extent of the Belcher I Action Judgment.
[37] While Smithfield Estates challenges the validity of the Hines Deed, discussed infra, § 34-16-9 enables a complainant in a quiet title action to include any such unknown persons that "claim" or "may claim" a right, title or interest in the real estate. The statute does not require that such claim be valid.
[38] Though mindful that persons or entities appearing in a chain of title cannot be served as "unknown defendants" because such claimants can be ascertained by reasonable diligence and should be joined as necessary parties, see e.g. Costa v. Silva,996 A.2d 607 (R.I. 2010), this Court recognizes that the Hines Deed would not have appeared in the chain of title for Lots 454 and 502. Moreover, the trial court in the Belcher I Action determined that the plaintiffs "made all reasonable efforts to ascertain the existence and whereabouts of defendants. . . ." (Defs. Mem. Ex. 47: Order of Notice.)
[39] Based on this Court's interpretation of the Belcher I Action Judgments, supra, the Filippis' identity of issues argument based on the quieting of title to the Extra Lots is now moot. However, this Court will still consider such argument in the context of the two tea lots to which the Filippis' predecessors in interest may have claimed interest — Lots 454 and 502.
[40] The Rhode Island Supreme Court adopted this approach in line with the First Circuit Court of Appeals decision to "officially embrace" the transactional definition as an inherent part of the law of res judicata in Manego v. Orleans Board of Trade,773 F.2d 1, 5 (1st Cir. 1985).
[41] The exceptions provided for in Restatement (Second)Judgments § 26 are as follows: (1) When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:
 (a) The parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein; or
 (b) The court in the first action has expressly reserved the plaintiff's right to maintain the second action; or
 (c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief; or
 (d) The judgment in the first action was plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme, or it is the sense of the scheme that the plaintiff should be permitted to split his claim; or
 (e) For reasons of substantive policy in a case involving a continuing or recurrent wrong, the plaintiff is given an option to sue once for the total harm, both past and prospective, or to sue from time to time for the damages incurred to the date of suit, and chooses the latter course; or
 (f) It is clearly and convincingly shown that the policies favoring preclusion of a second action are overcome for an extraordinary reason, such as the apparent invalidity of a continuing restraint or condition having a vital relation to personal liberty or the failure of the prior litigation to yield a coherent disposition of the controversy.
[42] As noted, Edith Belcher and Sarah Hayes sought to quiet title to these claimed Lake View Park tea lots by virtue of adverse possession in PC-02-1462. Any claims under that action have been assigned to Smithfield Estates.
[43] As discussed, the Belcher I Action also included unknown and unascertained defendants that claimed or may have claimed an interest to the Belcher Tea Lots.
[44] With the exception of those lots conveyed from Sarah Hayes and Edith Belcher to Paul Surabian on April 25, 2001. (Second Am. Compl. p. 81.)
[45] This Court finds a particular quote by a former Smithfield Building and Zoning Official over twenty years ago befitting in describing the tea lot controversies: "You, your kids, my kids, will never see a resolution to this problem." (Defs. Ex. 25: TheProvidence Journal article, dated 7/24/88.)
[46] This Affidavit is appended to the Defendants' materials as Supplemental Exhibit 50.
[47] Based on this determination, the Court need not establish whether res judicata would bar claims predicated upon possessory acts prior to the date of the Belcher I Action Judgment in 1989 or the date that the Belcher I Action was initiated in 1982, as disputed by the parties. However, this Court notes that claims arising from facts occurring after the filing of a first suit are not barred by res judicata. SeeRusso, 919 F. Supp. at 570-71 (Anticipating that Rhode Island courts would follow circuit courts confronting the issue and have refused to apply a res judicata bar to claims arising after the original lawsuit was filed).
[48] The Order denying the motion was entered by the Court on Oct. 22, 1997.
[49] This Court also notes that Mr. Surabian would not have been included as an "unknown" or "unascertained" defendant in the Conti Action since Mr. Surabian's alleged acts of adverse possession did not begin until 1982, only five years prior to the filing of the Conti Action Complaint. (Defs. Ex. 30: Surabian Action Complaint ¶ 10.)
[50] The Court emphasizes that the facts underlying the Conti Action differ from those supporting the Belcher I Action, and thus the result of this Court's transactional analysis is not the same. As discussed, claims by Edith Belcher and Sarah Hayes regarding adverse possession of lots other than the Belcher Tea Lots would not have created a convenient trial unit if combined with those claims set forth in the Belcher I Action, since such additional claims would have involved different property and hundreds of additional parties, and would have defeated the purpose and motivation behind that litigation.
[51] The Filippis contend that res judicata bars any claims based on Mr. Conti's adverse or constructive possession arising before final judgment entered in January of 1993. However, as noted above, any claims arising after the filing of the original action are not barred by res judicata. See Russo,919 F. Supp. at 570-71 (claims arising from events occurring after the filing of the original suit, but before the suit's resolution, are not barred by res judicata).
[52] The application of the doctrine is performed in such a manner as set forth by the United States Supreme Court in NewHampshire v. Maine, 532 U.S. 742, 749-56, 121 S. Ct. 1808,149 L. Ed.2d 968 (2001). See Gaumond v. Trinity RepertoryCo., 909 A.2d 512, 519-20 (R.I. 2006); D H TherapyAssoc., 821 A.2d at 693-94.
[53] Although Smithfield Estates cites § 34-13.1-5 et seq as the basis for its claim, this Court presumes that Smithfield Estates intended to cite the entire Marketable Record Title Act, § 34-13.1-1 et seq, as Chapter 13.1-5 addresses only the notice requirements for preserving a claim to land that might otherwise be marketable.
[54] The MRTA defines "root of title" as
 "that conveyance or other title transaction in the chain of title of a person, purporting to create or containing language sufficient to transfer the interest claimed by such person, upon which he relies as a basis for the marketability of his title, and which was the most recent to be recorded as of a date forty (40) years prior to the time when marketability is being determined. The effective date of the root of title is the date on which it is recorded." See § 34-13.1-1(e).
[55] See e.g. Pl.'s Suppl. Exs. 44, 50, 51, 53, 55-58.
[56] The Filippis also seek attorney's fees should this Court determine that Smithfield Estates has recorded a notice slandering the Filippis' alleged title to the Disputed Lots. (Pl.'s Mem. Ex. 3: Filippi Counterclaim ¶ 14.)
[57] In its Reply Memorandum, Smithfield Estates contends that any acts of possession by the Filippis within Chestnut Knoll are not relevant to the instant quiet title action concerning Lake View Park Plat.
[58] At the time of the purported tax sale at issue here, § 44-9-11 regulated interested party notice. In Robert P.Quinn Trust, 723 A.2d 1127, the Rhode Island Supreme Court declared that "[b]ecause § 44-9-11 does not provide for mail or personal notice to [the] readily identifiable interested parties, the statute is unconstitutional * * *." The statute was amended to reflect this holding in 2001. See
P.L. 2001, ch. 192, § 1.
[59] Subsection (b) was not in effect at the time of the purported tax sale in 1970. See P.L. 2002, ch. 140, § 1.
[60] In Harvey Realty, the Defendant condominium association was not a "taxpayer" entitled to statutory notice of a tax sale of four condominium units under § 44-9-10, since an individual, and not the association, was the "assessed account name" in city's records for tax purposes. The association, therefore, could not challenge validity of tax sale based on the alleged failure to satisfy notice requirements under that § 44-9-10. Defendant could, however, challenge the tax sale as an "interested party" under § 44-9-11. The Court ultimately upheld the lower court's determination that the condominium association had received minimum notice sufficient to meet due process requirements as an interested party under that version of § 44-9-11.
[61] The Court directs the parties to 3 Am. Jur. 2d AdversePossession § 259 concerning possession under color of title of several contiguous tracts.
[62] The Filippis have also set forth a Cross-claim against co-defendant, Mr. Surabian, relative to fifteen (15) specific lots listed in the Hines Deed: Lots 582, 584, 585, 587, 588, 589, 648, 706, 707, 708, 762, 763, 764, 825, and 880.
[63] The Filippis contend, however, that no notice was ever provided as to this tax roll transfer, and that they were under the impression that their tax bill reflected the taxes assessed on all tea lots until they discovered otherwise during this litigation. (Defs. Mem. Ex. 31: Aff. of Marion Filippi.)
[64] The Rhode Island Supreme Court recently examined the origin and philosophy underpinning the doctrine of adverse possession inCahill, criticizing the doctrine's role in a modern world. 11 A.3d at 88 ("[I]t is not without an eyebrow raised at the ancient roots and arcane rationale of adverse possession that we apply the doctrine to this modern property dispute").
[65] Section 34-7-1 provides:
 Where any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action.
[66] It was in 1976 that the Sleboda plaintiffs were notified of a purported redemption of the tax title.
[67] In reviewing the trial court's findings, theSleboda court also noted that the trial justice found that the "possessory activities, taken in conjunction with the fact of the published notice of the tax sale that had been given to defendants' predecessors in title and the recording of the [tax] deed . . . considered in conjunction with the payment of taxes each and every year from 1950 through 1975, constituted ample constructive notice of the hostile nature of plaintiffs' claims and of their possession and enjoyment of the property." Id at 658.
[68] Smithfield Estates points to the Filippis' deposition testimony identifying the John Deere store near the subject property, the Belcher homestead, Ballards and its parking lot across the street, and other commercial buildings. (Defs. Mem. Ex. 37: Dep. of Marion Filippi p. 32; Ex. 38: Dep. of Blake Filippi p. 25; Ex. 39: Dep. of Paul Filippi pp. 18-20.)
[69] Smithfield Estates is precluded, however, from claiming an interest in the Disputed Lots based on Mr. Conti's alleged possessory acts prior to the filing of the Conti Action in 1987.
[70] Paul Filippi testified:
 "Well, I knew that her [Edith Belcher] and my father had some type of arrangement. I was just, you know, walking through the land, as I always had done, and we started talking. You know, she brought up the fact that she was concerned that there were people trying to take over the property and she might get thrown off the land. I told her that we had no intentions on making her move. You know, as long as she was alone, she could live there. We had no plans on throwing her out."
[71] Apparently, there were several brief intervals when Walter Belcher was relocated due to employment; however, the Belchers rented the house and surrounding property to tenants.Id.
[72] As discussed, Paul Filippi alleges to have spoken to Edith Belcher on numerous occasions on the property; however, Sarah Hayes testified that neither she nor her mother ever spoke to members of the Filippi family. See Dep. of Sarah Hayes pp. 68-69.
[73] Though mindful that Smithfield Estates could not predict whether this Court would bar evidence of Mr. Conti's possessory acts prior to 1987, Smithfield Estates failed to address the Filippis' explicit challenge to the sufficiency of evidence of Mr. Conti's possessory acts both prior to and subsequent to the 1987 Conti Action set forth in the Filippis' motion and memoranda. Having no evidence of acts performed after 1987 apart from Mr. Conti's tax records, this Court is constrained to find that such a claim fails as a matter of law. See 3 Am. Jur. 2d AdversePossession § 147 (While the payment of taxes may be a weighty fact in support of adverse possession, it is not of itself sufficient to establish adverse possession); see alsoSleboda, 508 A.2d at 658 (possessory activities, taken in conjunction with the fact of the published notice of the tax sale . . . considered in conjunction with the payment of taxes . . . constituted ample constructive notice of the hostile nature of plaintiffs' claims).

 *Page 1